258 N.J. Super. 94 (1992)
609 A.2d 92
BOARD OF EDUCATION OF THE CITY OF CLIFTON, BOARD OF SCHOOL ESTIMATE OF THE CITY OF CLIFTON, PLAINTIFFS,
v.
W.R. GRACE CORP.; U.S. GYPSUM, INC., PFIZER, INC. AND BASIC INC., INDIVIDUALLY AND AS SUCCESSORS IN TO GIBSONBURG LIME PRODUCTS CO. AND KELLY ISLAND LIME & TRANSPORT CO.; ASBESTOS CORP., LTD.; CAREY-CANADIAN INC.; ISAAC DEGENAARS CONSTRUCTION CO.; RANDAZZO CONSTRUCTION CO.; THOMAS CONSTRUCTION CO.; LASKER GOLDMAN CONSTRUCTION CO.; CONLIN CONSTRUCTION CO.; BERT THOMAS/ATKINS CONSTRUCTION CO.; ROMAGNINO CONSTRUCTION CO. MAHIEU CONSTRUCTION CO.; RIEFOLO CONSTRUCTION CO.; JOHN DOES 1-5 (AS YET UNIDENTIFIED); JOHN DOES 5-10 (AS YET UNIDENTIFIED); JOHN DOES 15-20 (AS YET UNIDENTIFIED), DEFENDANTS.
Superior Court of New Jersey, Law Division Passaic County.
April 10, 1992.
*96 Anthony V. D'Elia, attorney for plaintiffs, (Carlin & D'Elia, attorneys).
Kevin T. Coughlin, attorney for defendant, Isaac DeGenaars Construction Co., (McElroy, Deutsch & Mulvaney, attorneys) Nancy McDonald on the brief.
DWYER, J.S.C.
Defendant, Isaac DeGenaars Construction Company ("DeGenaars"), the general contractor for construction of School No. 14, moved for summary judgment in its favor against the complaint of plaintiffs, Board of Education of the City of Clifton and the Board of School Estimate of the City of Clifton (hereinafter collectively "Clifton"), on the basis that it having followed the plans and specifications furnished by Clifton and having had no discretion to deviate from them it is entitled to governmental immunity.
After taking notice of asbestos problems in certain school buildings, or additions to school buildings, Clifton filed the complaint on June 20, 1985 against the manufacturer and distributors of acoustical plaster which contained asbestos, and which type of product was incorporated into 10 of Clifton's school buildings. With respect to School 14, Clifton's architect specified the product by name and manufacturer in the contract awarded to DeGenaars. Exhibit G to the Certificate of Nancy McDonald ("McDonald's Certif.") dated February 7, 1992.
*97 Clifton also sued the respective general contractors who had been awarded one or more contracts after competitive bidding to do the construction work which contains the aforesaid acoustical plaster.
Clifton essentially seeks the cost of removal of the asbestos from its schools.
On July 18, 1986 the defendant contractors, including DeGenaars, had the complaint dismissed as to them based on the statute of limitations in N.J.S.A. 2A:14-1.1 which bars action for damages against contractors for the construction of improvements to real property brought more than ten years after the completion of the construction.
On November 12, 1991, the Assignment Judge granted Clifton's motion to vacate the July 18, 1986 order and restore all the claims against the general contractors based on Livingston Board of Education v. U.S. Gypsum, 249 N.J. Super. 498, 505, 592 A.2d 653 (App.Div. 1991) (Board of Education could allege a claim based on strict liability in tort against manufacturers of products containing asbestos and such claim was not subject to the bar of the statute of limitations. Such an agency is acting in a governmental capacity and is entitled to the benefit of the rule that time does not run against the sovereign.)
In New Jersey Educational Facilities Authority, et al. v. The Gruzen Partnership, et al., 125 N.J. 66, 592 A.2d 559 (1991) the Supreme Court held that:
[T]he doctrine of nullum tempus is abrogated with respect to the State or its agencies insofar as it would preclude the application of general statutes of limitation to the State. This decision shall not be effective or applicable to claims made by the State or its agencies prior to December 31, 1991. Id. at 76 [592 A.2d 559]
The November 22, 1991 order restoring the claims against the contractors is consistent with the decision in Gruzen, supra.
In terms of pleadings, present counsel for DeGenaars admits that the original complaint was filed and properly served on DeGenaars and that Clifton was given leave to file an amended complaint and second amended complaint by court order. Said *98 counsel states that the form of those documents add parties but do not change the allegations as to anyone and more importantly were not filed. This is confirmed by the docket entries for this file.
In the general allegations of the complaint it is alleged in paragraph 6 that DeGenaars and other named general contractors sold and installed asbestos bearing materials. In paragraph 8 Clifton alleged that it caused the construction of certain school buildings and additions thereto and as part of said construction products containing asbestos were placed on ceilings of classrooms, halls, laboratories, administrative offices, and other rooms located throughout the schools.
In paragraph 10 Clifton alleged that the existence of the asbestos in said products constituted an imminent danger to the health of children, administrators, employees and members of the public who use said school buildings.
Clifton alleged that some of the asbestos had invaded carpeting, upholstery and other items in the schools requiring cleaning, removal and/or replacement. Clifton further alleged that the presence of the asbestos disrupted the scheduling of operations, required Clifton to expend large sums to investigate, and will have to incur large sums to remove the asbestos.
The court will not mention the counts which are directed to the manufacturers and distributors of the product. By letter opinion dated November 8, 1991, Judge Alterman traced the history of the manufacturer of "Kilnoise," the acoustical plaster product in School 14, starting with Kelly Island Lime and Transportation Co. ("KILT") through several acquisitions and sales to Pfizer, Inc. ("Pfizer"). Judge Alterman found that Kilnoise had been installed in Clifton's schools beginning in the 1940's through 1962.
Judge Alterman concluded:
GLPC purchased the Kilnoise product line from Basic and sold it to Pfizer. Pfizer is liable for the Kilnoise manufactured and sold by KILT and KI, since it purchased from Basic all of the manufacturing assets of Basic. Pfizer benefited *99 from the use of Kilnoise trade-name in manufacturing the same product line as its predecessor. Nieves v. Bruno Sherman Corp., supra. [86 N.J. 361, 431 A.2d 826 (1981)]
Judge Alterman further held that issues related to allocation of liability as between Basic Inc. ("Basic") and Pfizer were not before him then. He further held that there was no basis on the record before him for punitive damages.
Since the original complaint was filed on June 28, 1985, the provisions of the Products Liability Law, N.J.S.A. 2A:58-C-1 effective on July 22, 1987 are not applicable. See Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 95, 577 A.2d 1239 (1990).
DeGenaars was the general contractor for Clifton for the construction of School No. 14 in 1952 and 1953.
Arthur Rigolo ("Rigolo") was the architect for Clifton School No. 14 (Dep. Vol. I, 33) and (Vol. II 245). The work started in 1952 and was completed in 1953 (Vol. II 245 and 250).
After the architect was selected Rigolo described the process for preparing the plans and specifications that prevailed in 1952.
He stated that schematic drawings outlining the building were prepared. The schematics had to be submitted to Clifton and then to the New Jersey Department of Education for approval ("NJDE").
After NJDE approval of the schematics, Clifton authorized the funding for the project.
The architect then prepared preliminary drawings which were not sufficiently detailed for either bid purposes or doing actual construction. Clifton and NJDE had to approve those plans.
When those plans were approved by both, the architect prepared the final working drawings and specifications. During the 1950's, public contracts for construction had to be split among five categories: (1) general construction; (2) iron and steel; (3) plumbing; (4) heating and ventilating; and (5) electrical. (Vol. I, 33, 39)
*100 The working drawings show in drawing form what is to be done together with the notes on the drawings. The specifications set forth in words the equipment and materials to be used in the project. In Rigolo's words:
The specifications normally constitute the documents in which all the materials are described. (Vol. I, 36)
After the working drawings and specifications were complete, Rigolo sent them to NJDE for approval. At the relevant time, the NJDE had its own codes that were applicable to school buildings. Following a review process with NJDE representatives and correction for failure to meet code requirements, NJDE approved the working drawings and specifications. (Vol. I, 46, 49).
After the NJDE approved the plans and specifications, Clifton then proceeded to solicit bids for the five categories of work. (Vol. I, 50-51)
Rigolo recognized DB-20 dated August 14, 1952 as part of the specifications for Clifton School No. 14. (Vol. II, 246). They are attached as Exhibit "G" to McDonald's Certif.
It contained the specifications for General Construction, F-Lathing and Plastering.
Under 2. Materials on p. GC-F-1 it is stated:
(e) Lime: Hydrated finishing lime, Tiger Finish (Kelly Island Lime & Transport) and/or in accordance with ASTM:c6-31. Also white plaster of Paris (calcined Gypsum) in accordance with ASTM C28-40.
(f) Acoustical Plaster. Kilnoise (Kelley Island Lime and Transport) Per manufacturer's directions and Specs. See Room Finishing Schedule.
Rigolo stated that the general contractor had responsibility for doing the work but usually employed a subcontractor to do the lathing and plastering work. (Vol. I, 82)
In the first deposition to a question predicated on statements that during the period 1942 to 1962 there were various acoustical plaster products available for use, Rigolo stated:
I think there were ...
I can think of two that  maybe three that were available.
Q. Okay what were those that you were familiar with?

*101 A. I think Sabinite was one, Kilnoise was another one. And your third one I can't remember.
But  but you know that architects make use of Sweet's Catalog. (Vol. I, 97)
In the second deposition after Rigolo had identified and examined DB-20, there appears:
Q. All right. And is that document in the format which you utilized in the past?
A. Somewhat. It calls for acoustical plaster and it mentions  parenthetically it mentions Kelley Island Lime and Transport.
Q. Okay. Am I correct that in this case you mention the use of Kilnoise as a product you don't list Sabinite as well.
A. In this one, no.
Q. Do you recall any reason for that?
A. I don't know.
Q. Okay.
A. I don't know.
Rigolo could not recall whether Kilnoise was used in School 14 from memory. (Vol. II, 245-247)
Rigolo and his staff reviewed the progress of the work and compliance with the plans and specifications several times a week. Clifton also had a Clerk of the Works on the job site daily during every working hour to see that the contractors and subcontractors complied with the plans and specifications. (Vol. I, 61, 62)
There is no dispute that Clifton School No. 14 contains Kilnoise.
There is no dispute that DeGenaars worked only on Clifton School No. 14.
The court now considers the legal basis for DeGenaars contention that as an independent contractor for a public entity which provided the contact drawings and specifications to said contractor it should not be held liable for work performed in accordance with those plans and specifications.
It relies upon Vanchieri v. New Jersey Sports & Exposition Authority, 104 N.J. 80, 86, 514 A.2d 1323 (1986); McDermott v. TENDUN Constructors, 211 N.J. Super. 196, 511 A.2d 690 (App.Div. 1986) certif. den. 107 N.J. 43, 526 A.2d 134 (1986); Rodriguez v. N.J. Sports and Exhibition Authority, 193 N.J. *102 Super. 39, 45, 472 A.2d 146 (App.Div. 1983) certif. den. 96 N.J. 291, 475 A.2d 586 (1984); Sanner v. Ford Motor Company, 154 N.J. Super. 407, 409, 381 A.2d 805 (App.Div. 1977) certif. den. 75 N.J. 616, 384 A.2d 846 (1978); and Cobb v. Waddington, 154 N.J. Super. 11, 18, 380 A.2d 1145 (App.Div. 1977).
In each of the above cases a third party who was injured sued either a public entity and an independent contractor or an independent contractor, which performed work for the relevant public entity under a contract drawn by the latter. In each case there was either a holding or a statement that the government contractor was immune from a suit by a third party.
In Vanchieri, supra, the Supreme Court explained the rationale for the independent contractor defense and the limitations of its application. In that case Vanchieri with friends watched a preseason football game at Giant Stadium. After the game, Vanchieri and her friends waited in their seats for the crowd to disperse. After fifteen minutes she and her friends proceeded to leave.
They then proceeded to exit areas. While crossing a hallway three youngsters who were roughhousing, knocked Vanchieri down. She sustained severe injuries.
She sued the Sports Authority ("Authority") and Wackenhut Company ("Wackenhut"), the Authority's independent contractor to provide uniformed guards at Giant Stadium.
The Authority moved to dismiss upon alternative grounds of immunity under N.J.S.A. 59:1-1 et seq. Wackenhut had not pleaded as an affirmative defense contractor's immunity. But Wackenhut joined in the motion. The trial court granted summary judgment to both. The Appellate Division affirmed. The Supreme Court reversed. The decision sets forth the rationale.
NJSEA is a public entity within the meaning of the Tort Claims Act. Blazer Corp. v. NJSEA, 195 N.J. Super. 542, 547 [480 A.2d 953] (Law Div. 1984), aff'd, 199 N.J. Super. 107 [488 A.2d 1025] (App.Div. 1985). "Public entity' includes the State, and any county, municipality, district, public authority, public agency, and any other political subdivision or public body in the State." N.J.S.A. 59:1-3. *103 A public employee, also entitled to statutory immunity, is an employee of a public entity. Although the term "employee" is defined broadly, independent contractors are expressly excluded from its scope. Id. Wackenhut is not entitled, under the language of the Act, to immunity from tort claims. Nonetheless, independent contractors in general, and Wackenhut Company in particular, do, under well-recognized principles, share to a limited extent the immunity of public entities with whom they contract.
When a public entity provides plans and specifications to an independent contractor, the public contractor will not be held liable for work performed in accordance with those plans and specifications. This rule rests on two important principles. First, the immunity of the entity itself would become meaningless if contractors complying with its design were liable in tort for defects in that design. Cobb v. Waddington, 154 N.J. Super. 11, 18 [380 A.2d 1145] (App.Div. 1977), certif. den., 76 N.J. 235 [386 A.2d 859] (1978); Sanner v. Ford Motor Co., 144 N.J. Super. 1, 9 [364 A.2d 43] (Law Div. 1976), aff'd, 154 N.J. Super. 407 [381 A.2d 805] (App.Div. 1977), certif. den., 75 N.J. 616 [384 A.2d 846] (1978). If contractors never shared government immunity, their costs of doing business would be higher and those higher costs would be passed on to the government entities hiring the contractors. In respect of costs, therefore, the effect would be nearly the same as if the public entity were liable itself.
The second principle underlying public contractor immunity concerns notions of fairness. An independent contractor bound to specifications that are provided by a public entity and over which it has no control is not responsible for defects in those specifications. It would be fundamentally unfair to hold a contractor liable in that instance for injury caused by defective plans, at least in the absence of a blatant, obvious danger that the contractor should have brought to the attention of the public entity. Lydecker v. Freeholders of Passaic, 19 [91] N.J.L. 622, 626-27, 103 A. 251 (E. & A. 1912) [1918]; see also Comment, "The Government Contractor Defense: An Overview," 27 How. L.Rev. 275 (1984) (The immunity of the contractor to shoulder alone the entire burden of liability for an injury which occurred, not because of his own wrongdoing, but merely because of his innocent compliance with the government's specifications."). Id. at 85-86 [514 A.2d 1323]
The opinion goes on to note that contractor's immunity is an affirmative defense. Wackenhut had not expressly pleaded it. Wackenhut did move for summary judgment following the Authority's motion. The contract between the Authority and Wackenhut was before all the courts. The contract gave the Authority power to direct and specify the location of guards and the right to approve specific assignments. But Justice Clifford pointed out that the record did not show what plans and directions, if any, the Authority had approved for the day in question; hence, there was no factual predicate for an *104 independent contractor's immunity defense based on the exercise of discretionary judgment by a public entity.
Clifton urges that under Holloway v. State, 239 N.J. Super. 554, 571 A.2d 1324 (App.Div. 1990) modified 125 N.J. 386, 593 A.2d 716 (1991), there is no question that the State can sue its contractors in strict liability.
The Supreme Court opinion at 125 N.J. at 390, 593 A.2d 716 makes clear that whatever the contractual relations were with the various "pool defendants," the State had decided to build on its own the deck around the above ground pool manufactured by one defendant and sold by another. The State personnel had obtained the idea to build the deck from an illustration in the manufacturer's catalog showing a child diving into the pool from a deck. The other defendants had manufactured and sold a replacement liner for the pool. There is nothing in the reported decisions that show the defendants acted in response to contract drawings or specifications prepared by the State. None of the pool defendants built the deck.
The Supreme Court affirmed the Appellate Division reversal of the judgment of the trial court's decision granting summary judgment to the pool defendants against the State's claim for contribution and indemnification on the grounds based on strict liability in tort that under N.J.S.A. 59:9-2(b) Holloway could not sue the State in strict liability in tort. The Appellate Division said that the statute does not bar the State and further there is no need for the law to be symmetrical in this regard. [239 N.J. Super. at 559, 571 A.2d 1324]
The Supreme Court then said:
In concluding that the State's direct claim for reimbursement for its medical expenses by way of subrogation is barred by the statute of limitations, we note that the State has also variously contended that its entitlement to those medical expenses in whole or in part is encompassed by its claims for indemnification and contribution. We agree. As earlier noted, Holloway sued the State for damages, including her medical expenses. The State in suing the pool defendants referred to Holloway's claim and sought indemnification and contribution based on any judgment that Holloway might obtain against it. A plaintiff's *105 reasonable medical expenses ordinarily constitute part of that judgment. Long v. Landy, 35 N.J. 44, 55-56, 171 A.2d 1 (1961). [125 N.J. at 399, 593 A.2d 716]
The Supreme Court held that the State could assert a strict products liability claim against its contractors on the facts in that case. It concluded:
The pool defendants assert that for Holloway to recover in her suit, she must prove that the State's conduct was "palpably unreasonable," see N.J.S.A. 59:4-2 (for State to be liable for maintaining dangerous condition on its property, plaintiff must establish that State acted in palpably unreasonable manner), and that such conduct, as a matter of law, cannot be objectively foreseeable. Brown v. United States Stove Co., 98 N.J. 155, 166-67, 484 A.2d 1234 (1984). We previously have indicated that "palpably unreasonable" implies "behavior that is patently unacceptable under any circumstance" and that "it must be manifest and obvious that no prudent person would approve of its course of action or inaction." Kolitch v. Lindedahl, 100 N.J. 485, 493, 497 A.2d 183 (1985) (citations omitted).
The Appellate Division rejected the pool defendant's contention, as do we. It stated:
It is unclear whether plaintiff's case will target the dangerous condition of State property, failure to warn, or negligent supervision of prisoners' activities, or all of them. It is thus not necessarily so that the State can be held liable only if its conduct was palpably unreasonable. Secondly, "palpably unreasonable" does not necessarily mean "very" negligent, "grossly" negligent or "extraordinarily" negligent. Thirdly, a products liability defendant may be held liable even in the event of product misuse, if the misuse was objectively foreseeable (citing Brown, supra, 98 N.J. 155 [484 A.2d 1234]). We cannot say that as a matter of law the State's conduct in this case was not foreseeable. [239 N.J. Super. at 560, 571 A.2d 1324.] [125 N.J. at 403-404, 593 A.2d 716]
This court does not find the Holloway case dispositive of the questions presented herein. The State purchased in the open market products designed and sold by manufacturers on their own plans. The State did not limit in any way by its contract of purchase the design of the pool or the materials to be used. As developed infra the fact that a person may be barred from suing a public entity for reason may not be a sound predicate for the defense of government contractor immunity.
In McDermott, supra, plaintiff, Christine McDermott, widow of Michael McDermott, in various capacities as General Administratrix, Administratrix ad prosequendum of and as parent and guardian for the minor children sued various contractors *106 and the architect involved in the construction of the facilities of the New York Bulk and Foreign Mail Center ("NYB & FMC") in Secaucus, New Jersey, grounded in claims of negligence, breach of warranty, and strict liability in tort for the death of Michael McDermott.
He was found dead underneath the head of an extendable conveyor which was delivering mail into the trailer section of a tractor-trailer being loaded at the facility. His task was to stack the mail in the trailer.
The action was brought under the Federal Tort Claims Act, 28 U.S.C.A., Sec. 2680(a).
The United States Post Office Department ("POD") entered into a contract with Knight, an architectural firm, to develop "new and improved engineering concepts and plans for mechanized mail processing systems." It further provided that Knight was to provide:
furnish all engineering and other services and materials necessary for the development of a mail processing system concept for the two [planned] facilities, including the preparation of the specifications for the facilities and the mechanization to be used for mail processing. These specifications [were to] conform to best industrial practices and [were to] be adequate to permit the solicitation of bids for construction of the facilities and the procurement of the mail processing equipment to be used therein. [Emphasis supplied].
Pursuant to its contract with the POD, Knight thereafter prepared a bid package which was submitted to and approved by the POD. In developing this bid package, Knight prepared specifications and drawings which, pursuant to the terms of its contract with the POD:
ma[d]e use of existing POD standard components, drawings, design details and drawing practices to the extent that they [were] consistent with [its] overall plan for the design of these systems and [did] not interfere with [its] freedom to provide a functional system design in accordance with standard industrial practices. [Emphasis supplied]. [211 N.J. Super. at 201-202, 511 A.2d 690]
After approving the bid package prepared by Knight, the POD entered into an interagency agreement with the Army corps of Engineers ("Corps"). Said contract provided that the Corps would solicit bids and supervise the construction of the facilities and installation of equipment.
*107 Following competitive bidding the Corps awarded the general contract to TENDUM. TENDUM in turn subcontracted with Rohr to:
design, furnish, and deliver ... all of the mechanization equipment ... in strict accordance with all of the Proposal Documents, Technical Provisions, Addenda, Amendments and Drawings, hereinafter referred to as "The Contract Documents,' all as prepared by Lester B. Knight & Associates, Inc.... and the Department of the U.S. Army, Corps of Engineers.... [211 N.J. Super. at 202, 511 A.2d 690]
The opinion indicates that Rohr prepared shop drawings in accordance with the Contract Documents for the fabrication of the mechanized equipment, including the extendable conveyor. Both Knight and the Corps reviewed and approved them.
In addition Rohr prepared a pre-production model of the extendable conveyor. The model was tested operationally. Knight and the Corps compiled a punch list of corrections to be made before production. These corrections were made. The extendable conveyors were then produced and delivered to the facilities.
The Appellate Division stated:
During these pre-production inspections, the "stop and go" control for the model extendable conveyor, which had been manufactured by Controlmation, was temporarily mounted on the machine, with clamps, in a location generally designated in the specifications prepared by Knight. According to these Sack Handling Systems Specifications, each extendable conveyor at the NYB & FMC was to be controlled "from a control station at the head end of the conveyor." During a pre-delivery inspection, Charles Schroer, the area engineer and resident contracting officer for the Corps, specifically directed where the pushbutton controls ultimately were to be permanently placed. Accordingly, at the time the completed conveyors were installed at the NYB & FMC facility, the controls were affixed at the location designated by the Corps representation. There is no dispute that, when the conveyors were turned over to the POD, they were in full compliance with the contractual plans and specifications which had been prepared by Knight and approved and adopted by the POD. [211 N.J. Super. at 203-204, 511 A.2d 690]
On the appeal following an initial remand to the trial court for specific findings of fact and conclusions of law, the Appellate Division affirmed the granting of summary judgment in favor of the contractors on the grounds that they were entitled to governmental immunity.
*108 The trial court denied summary judgment to Knight on the defense of governmental immunity. The Appellate Division affirmed. Judge Michels for a unanimous court said:
Accordingly, in developing its designs for NYB & FMC, Knight was not strictly bound by government specifications or demands. Indeed, the Sack Handling Systems Specifications utilized in the production of the extendable conveyors did not exist until Knight created them. It has been recognized that to rely on a "government contract defense," the obligation from which a defendant seeks immunity must have been contained within the contract which was executed with the government. Merritt, Chapman & Scott Corp. v. Guy F. Atkinson Co., 295 F.2d 14, 15 (9th Cir. 1961). However, where, as here, the record reveals no evidence that a defendant was required by any governmental directive to do that which was charged against it, the "government contract defense" is unavailable. Id. at 16. See also McKay v. Rockwell International Corp., 704 F.2d 444, 450 (9th Cir. 1983), cert. den., 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984) (when only minimal or very general requirements are set forth by the United States contract, the government contractor defense is inapplicable). [211 N.J. Super. at 207, 511 A.2d 690]
The Appellate Division then affirmed the summary judgment granted in Knight's favor by the trial court on the ground that based on plaintiff's expert testimony on deposition that plaintiff failed to make a prima facie case that there was any design defect in the extendable conveyors which Knight designed.
Plaintiff's expert only testified about a defect that existed at the time of the accident. After setting forth the proper standard for liability for design defect, Judge Michels pointed out that as designed the extendable conveyor had the guards plaintiff's expert called for and the controls at the location which plaintiff's expert testified were proper. The reason that they were not in place as designed was that changes were made after installation at the POD facilities which changes plaintiff's expert had not testified were foreseeable changes chargeable to the designer.
With respect to other changes dictated by the Resident Engineer for the Corps, the Appellate Division held that since that decision was made by a governmental entity those changes were such to be subject to the defense of governmental immunity as against the POD and Corps.
*109 This court has not quoted the reasons set forth by the Appellate Division in McDermott, supra, at 206, 511 A.2d 690 for its holding of non-liability for an independent contractor based on governmental immunity. They are similar to the dicta in Vanchieri quoted, supra, page 10.
In Boyle v. United Technologies, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988) Justice Scalia writing for a majority of the Supreme Court articulated the criteria to be applied when an independent contractor with the United States for the supplying of military equipment would have the defense of contractor immunity in suits by third parties under tort laws of the respective states.
David Boyle, a Marine helicopter co-pilot, was killed when his helicopter crashed during a training mission off the coast of Virginia Beach, Virginia. He survived the initial crash. But he drowned because the escape mechanism was designed to open outward instead of inward. The helicopter being under water, the escape mechanism was not able to overcome the pressure of the water outside.
His father sued Sikorsky Division of United Technologies which built the helicopter under contract with the Navy. The suit was in the United States District Court for Virginia under theories of Virginia tort law.
The claim relevant to the issue before this court was that Sikorsky had improperly designed the emergency escape mechanism for the co-pilot's cockpit. The jury returned a verdict for the plaintiff. The District Court entered judgment against Sikorsky. The Court of Appeals reversed and remanded with directions that judgment be entered in favor of Sikorsky, 792 F.2d 413 (C.A.4, 1986), on the grounds that Sikorsky satisfied the requirements of the military contractor defense.
Justice Scalia analyzed a number of areas where federal interests have been held to be sufficient to warrant federal interest to prevail over state law. He concluded:

*110 The present case involves an independent contractor performing its obligation under a procurement contract, rather than an official performing his duty as a federal employee, but there is obviously implicated the same interest in getting the Government's work done.
We think the reasons for considering these closely related areas to be of "uniquely federal" interest apply as well to the civil liabilities arising out of the performance of federal procurement contracts. We have come close to holding as much. In Yearsley v W.A. Ross Construction Co., 309 US 18, 84 L Ed 554, 60 S Ct 413 (1940), we rejected an attempt by a landowner to hold a construction contractor liable under state law for the erosion of 95 acres caused by the contractor's work in constructing dikes for the Government. We said that "if [the] authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will." Id., at 20-21, 84 L Ed 554, 60 S Ct 413 [at 414]. The federal interest justifying this holding surely exists as much in procurement contracts as in performance contracts; we see no basis for a distinction. [487 U.S. at 505-506, 108 S.Ct. at 2515, 101 L.Ed.2d at 453-454]
Justice Scalia further stated:
That the procurement of equipment by the United States is an area of uniquely federal interest does not, however, end the inquiry. That merely establishes a necessary, not a sufficient, condition for the displacement of state law. Displacement will occur only where, as we have variously described, a "significant conflict" exits between an identifiable "federal policy or interest and the [operation] of state law," Wallis [v. Pan Am. Petroleum Corp.] supra, [384 U.S. 63] at 68, 16 L Ed 2d 369, 86 S Ct 1301 [at 1304 (1966)], or the application of state law would "frustrate specific objectives" of federal legislation, [U.S. v.] Kimbell Foods, supra, [440 U.S. 715] at 728, 59 L Ed 2d 711, 99 S Ct 1448 [at 1458 (1979)]. The conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption when Congress legislates "in a field which the States have traditionally occupied." Rice v Santa Fe Elevator Corp., 331 US, at 230, 91 L Ed 1447, 67 S Ct 1146 [at 1152]. Or to put the point differently, the fact that the area in question is one of unique federal concern changes what would otherwise be a conflict that cannot produce preemption into one that can. But conflict there must be. [487 U.S. at 507-508, 108 S.Ct. at 2515-2516, 101 L.Ed.2d at 454-455]
Justice Scalia continued that where the United States in procurement only specified the capacity of such an item as an air conditioner but nothing else then it was purchasing a shelf item. If a state law required a safety feature for such an air conditioner, then such a requirement would not be anything identical to what the Government required or contrary to it. In such a context, the Justice concluded that state law should not be pre-empted.
*111 Justice Scalia also stated that where military personnel on duty are prohibited from suing for injuries under the Federal Tort Claims Act, the Feres [v. U.S., 340 U.S. 135, 71 S.Ct. 153] doctrine permitted the provider of military equipment a government contractor's defense. The basis for that line of reasoning was that to allow such suits would increase the costs of procurement contacts because contractors would raise their prices to the Government and thereby defeat the very purpose of the immunity of the Government against such suit. Justice Scalia said:
We do not adopt this analysis because it seems to us that the Feres doctrine, in its application to the present problem, logically produces results that are in some respects too broad and in some respects too narrow. Too broad, because if the Government contractor defense is to prohibit suit against the manufacturer whenever Feres would prevent suit against the Government, then even injuries caused to military personnel by a helicopter purchased from stock (in our example above), or by any standard equipment purchased by the Government, would be covered. Since Feres prohibits all service-related tort claims against the Government, a contractor defense that rests upon it should prohibit all service-related tort claims against the manufacturer  making inexplicable the three limiting criteria for contractor immunity (which we will discuss presently) that the Court of Appeals adopted. [487 U.S. at 510-511, 108 S.Ct. at 2517-2518, 101 L.Ed.2d at 456-457]
Justice Scalia concluded that the proper basis was found in the Federal Tort Claims Act and stated:
United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs. To put the point differently: It makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production. In sum, we are of the view that state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a "significant conflict" with federal policy and must be displaced.
We agree with the scope of displacement adopted by the Fourth Circuit here, which is also that adopted by the Ninth Circuit, see McKay v. Rockwell Int'l Corp. supra, at 451. Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. The first two of these conditions assure that the suit is within the area where the policy of the "discretionary function" would be frustrated  i.e., they *112 assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself. The third condition is necessary because, in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability. We adopt this provision lest our effort to protect discretionary functions perversely impede them by cutting off information highly relevant to the discretionary decision. [487 U.S. at 512-513, 108 S.Ct. at 2518-2519, 101 L.Ed.2d at 457-458]
Based on the authorities cited above, this court concludes that where a third-party sues a government contractor who has contracted with a public entity which contract (1) has reasonably precise specifications approved by the public entity; and (2) the contractor has performed in confirmance with those specifications, then the contractor should have a government contractor's defense.
This court has not overlooked the third element of Justice Scalia's criteria. But in construction contracts this court concludes that a different statement of the third criteria is appropriate.
Returning to Vanchieri, supra, Justice Clifford stated that a second factor in allowing an independent contractor who, or which, had to perform under government imposed specifications was one of fairness, supra, page 11.
In addition to fairness there are other factors that the courts have considered with the development of the law on strict liability in tort where the owner of land enters into a contract with an independent contractor for the construction of a building in accordance with plans and specifications provided by the owner or where the owner retains the power to direct that certain specific items are to be installed. They hold that the principles applied in such cases as Schipper v. Levitt & Sons, Inc., 44 N.J. 70, 207 A.2d 314 (1965) (Builder of hundreds of homes in accordance with his own design and specifications, which prove defective, is liable on principles of strict liability in tort to persons who sustain injury.) do not apply to the independent contractor in the class being considered.
*113 The basis for the builder's liability in Schipper was set forth by Justice Jacobs:
We consider that there are no meaningful distinctions between Levitt's mass production and sale of homes and the mass production and sale of automobiles and that the pertinent overriding policy considerations are the same. That being so, the warranty or strict liability principles of Henningsen and Santor should be carried over into the realty field, at least in the aspect dealt with here. Incidentally, recent reference to the sweep of Levitt's mass production approach may be found in the July 1963 issue of American builder, at pages 42-45 where the president of Levitt, in response to an inquiry as to whether its policy of "no changes" would be applied in the building of its more expensive homes at Long Island, has this to say: "We intend to hold to our mass production approach in Long Island. People buy Cadillacs, don't they, and they're mass produced." See 12 Rutgers L.Rev. 529, 532 (1958).
When a vendee buys a development house from an advertised model, as in a Levitt or in a comparable project, he clearly relies on the skill of the developer and on its implied representation that the house will be erected in reasonably workmanlike manner and will be reasonably fit for habitation. He has no architect or other professional adviser of his own, he has no real competency to inspect on his own, his actual examination is, in the nature of things, largely superficial, and his opportunity for obtaining meaningful protective changes in the conveyancing documents prepared by the builder vendor is negligible. If there is improper construction such as a defective heating system or a defective ceiling, stairway and the like, the well-being of the vendee and others is seriously endangered and serious injury is foreseeable. The public interest dictates that if such injury does result from the defective construction, its cost should be borne by the responsible developer who created the danger and who is in the better economic position to bear the loss rather than by the injured party who justifiably relied on the developer's skill and implied representation. Id. at 90-91 [207 A.2d 314]
Although the last two editions of Prosser, Law of Torts, Sec. 104 (4th ed. 1971) and Keeton, Prosser and Keeton on Torts, Sec. 104A (5th ed. 1984), stated that the basis of liability for builders in cases such as Schipper, supra, was correct, it was further stated it should be limited to that category of mass builders and not applied to the type of independent contractor who builds single structures one at a time under plans furnished by the owners.
In Leininger v. Stearns-Roger Manufacturing Company, 17 Utah 2d 37, 404 P.2d 33 (1965), the Supreme Court affirmed the granting of summary judgment for defendant, Stearns-Roger Manufacturing Company ("GC") against plaintiff's Leininger's *114 ("Leininger") complaint seeking damages for injuries sustained when a Durco fan installed by GC exploded while Leininger tried to remove the back to clean it. The complaint was based on negligence and breach of warranty.
Leininger was employed by Texas-Zinc ("T-Z") at a uranium ore processing plant. T-Z had contracted with GC for GC to build and turnover to T-Z a complete uranium ore processing plant and copper concentrating plant ready for operation in a manner satisfactory to T-Z. The contract contained the following:
[p]rovided however that the Contractor shall have no responsibility for the adequacy of certain major items of equipment selected solely by the Company where the same are properly installed and functioning in accordance with the manufacturer's representations. Id. [404 P.2d] at 35
The Supreme Court said:
The instant case is not one of the contractee accepting an instrumentality constructed or repaired by the contractor according to a plan or design furnished by the contractee to the contractor; this is a case wherein the contractee, Texas-Zinc, selected and specifically required the securing and furnishing by the defendant contractor of a name-brand, fully operational instrumentality, the acceptance of which by the contractee, Texas-Zinc, was foreordained by its contract with Sterns-Roger, the defendant contractor. The defendant contractor, in the instant case, was a mere vehicle, a conduit through which the Durco fans passed; it did not design, sell or recommend the installation of such fans, and had no discretion in their selection; there was no claim of any act of negligence on defendant's part in the placement of the fans in the laboratory of Texas-Zinc pursuant to specifications; and neither did the defendant contractor have knowledge, actual or constructive, of the propensity of such type fans to explode following extended daily use and when in need of servicing. [Emphasis added] Id. at 36
The Supreme Court then pointed out that the New York Court of Appeals which decided MacPherson v. Buick, 217 N.Y. 382, 111 N.E. 1050 (Ct. of A.N.Y. 1916) had imposed a limitation with respect to builders.
An important limitation on the rule placing building contractors on the same footing as sellers of goods is that the contractor is not liable if he has merely carried out the plans, specifications and directions given him, since in that case the responsibility is assumed by the employer, at least when the plans are not so obviously dangerous that no reasonable man would follow them. The rule, as stated in Ryan v. Feeney & Sheehan Bldg. Co., 239 N.Y. 43, 145 N.E. 321, *115 41 A.L.R. 1 (1924), which is the same court which earlier had decided MacPherson v. Buick, supra, is as follows:
* * * A builder or contractor is justified in relying upon the plans and specifications which he has contracted to follow, unless they are so apparently defective that an ordinary builder of ordinary prudence would be put upon notice that the work was dangerous and likely to cause injury.
And this rule was followed and cited approvingly by Judge Learned Hand in Person v. Cauldwell-Wingate Co., 2 Cir., 187 F.2d 832, cert. den. 341 U.S. 936, 71 S.Ct. 855, 95 L.Ed. 1364 (1951). See also: Russell v. Arthur Whitcomb, Inc., 100 N.H. 171, 121 A.2d 781; Tipton v. Clower, 67 N.M. 388, 356 P.2d 46; Trustees of the First Baptist Church of Corinth v. McElroy, 223 Miss. 327 78 So.2d 138; Davis v. Henderlong Lumber Company, D.C., 221 F. Supp. 129 (1963). Id. [404 P.2d] at 36
That opinion recites that Durion that manufactured the Durco fans used litharge and glycerin to make the sealant for the fans. In 1962 Durion learned that when its fans were used to exhaust perchloric acid fumes the ingredients of the sealant reacted with the perchloric acid to create an explosive. This was five years after the GC installed the fans. Durion then gave general notice of the danger to those who had the fans and stopped selling them to those who intended to use them to exhaust perchloric acid fumes.
The Supreme Court rejected the contention that there was an express warranty by the GC. The GC installed the fans selected by the chief chemist for T-Z and installed them without the appearance of any visible defect and in accordance with the specifications. On those facts the Supreme Court held there was no basis for liability of the GC
on breach of an express warranty for the designated use, and there is no basis for an implied warranty for fitness since the contractor provided the identical fans which he was required to furnish. The damages suffered by the plaintiff were directly caused by the unsuitability of the exhaust fans for use in a chemical laboratory of the kind here involved rather than by the nature of the defendant contractor's performance of his contract.... [Citations omitted]
The Supreme Court concluded:
The plaintiff further takes the position that factual issues are posed which are not proper for summary judgment. Plaintiff argues that the defendant "contractor is liable when the product of his work is inherently or imminently dangerous," and that the defendant contractor knew, or should have known, of the danger inherent in the Durco fans, and was negligent in supplying them even though specifically directed so to do by the chief chemist *116 of Texas-Zinc. The Durco fans were not the product of the defendant's work  and were fully assembled, name-brand fans, and were merely placed by the defendant in their designated locations pursuant to plans and specifications; and at the time of their placement, no one was aware of any hazard incident to their intended use. Summary judgment is not a substitute for trial but is rather a judicial search for determining whether genuine issues exist as to material facts. Rule 56, Utah rules of Civil Procedure, dictates the granting of summary judgment where there is no genuine issue of a material fact. The plaintiff in the instant case has attempted to create factual issues, but the whole purpose of summary judgment would be defeated if a case could be forced to trial by a mere assertion that an issue exists. National American Life Insurance Company, etc. v. Bayou Country Club, Inc. et al., [16] Utah [2d 417] 403 P.2d 26 (June 1965); see also Davis v. Henderlong Lumber Company, D.C., 221 F. Supp. 129 (1963). Id. [404 P.2d] at 37-38
In Jackson, Administratrix v. City of Franklin, B.D. Morgan & Co., et al., 51 Ohio App.3d 51, 554 N.E.2d 932 (1988) the plaintiff, Joyce J. Jackson ("Jackson"), mother of an infant son who drowned in a swimming pool appealed from a summary judgment granted in favor of B.D. Morgan & Co. ("Morgan"). Morgan built the subject pool as general contractor in accordance with plans and specifications prepared by Midwestern Pool Company ("Midwest") which designed the pool and prepared the plans and specifications for the defendant, City of Franklin ("City"). The contract was awarded after competitive bidding.
Jackson's son had paid admission to enter the pool. He was found at the bottom of the deep area at the western edge of the pool. He had lost consciousness while swimming and remained submerged for ten minutes. Jackson alleged that the improper alignment of the lifeguards' chairs made it difficult to observe clearly the area of the pool where her son drowned because of the shadow of the diving boards and the glare of the sun from the water in late afternoon. Consequently the pool as built and the chairs as located made the pool an unreasonably dangerous place and, hence, Morgan was strictly liable under applicable Ohio statutes.
The trial court in granting Morgan's motion had found that there was no showing that Morgan had negligently performed the contract or deviated from the design of the pool furnished to the City by Midwest.
*117 With respect to the claim based on strict liability in tort, the trial court held that there was no allegation that Morgan and its subcontractors had furnished anything except construction or installation and furnished labor and material for that purpose.
The Court of Appeals reviewed Jackson's contentions based on 2 Restatement of the Law, 2d Torts, Sec. 385 (1965) and the development of the liability in tort as applied to builders.
After citing Terry v. New Mexico State Highway Comm., 98 N.M. 119, 645 P.2d 1375 (1982) (Contractor who built curve in highway in accordance with plans and specifications furnished by state held not liable for death of plaintiff's deceased. The plans were not so openly defective, that no reasonable contractor would refuse to build in accordance with them.) The plans were consistent with the standards for state plans. The Court of Appeals concluded that:
reasonable minds could only conclude that the dangerous condition alleged in the plaintiff's complaint was not such an obvious defect in the design of the pool and its appurtenances that no reasonable contractor would have built the pool as designed. Accordingly, we find the trial court properly found that there were no material facts in dispute and the defendant was entitled to judgment as a matter of law. Id. [554 N.E.2d] at 937
The Court of Appeals then reviewed Jackson's contention that Morgan should be responsible in strict liability in tort based on 2 Restatement of the Law 2d, Torts, Sec. 402A, 345 (1965). That court agreed with Iacono v. Anderson Concrete Corp., 42 Ohio St.2d 88, 71 O.O.2d 66, 326 N.E.2d 267 (1975) wherein the defendant contractor which had used concrete to build a driveway and sidewalk for plaintiff homeowner was held liable based on an implied warranty of fitness for use. Therein, the popping and cracking in the said driveway and sidewalk was due to an ingredient in the concrete.
This case did not establish that a home could be a defective product, but that there was a defect in some product (concrete) installed therein rendering damaging to the property. Id. [554 N.E.2d] at 937
The Court of Appeals cited Lowrie v. Evanston, 50 Ill. App.3d 376, 8 Ill.Dec. 537, 365 N.E.2d 923 (1977) (Plaintiff could not recover for deceased husband's death falling from *118 Evanston's public parking garage based on strict liability in tort on grounds that said garage and/or the parking spaces in it were products sold within the meaning of 2 Restatement of the Law, 2d Torts, Sec. 402 A comment c. (1965)), and quoted extensively from that decision.
The Illinois court pointed out the definitions of product and sale for the purposes of the rules in the Restatement had to be defined in terms of the public policy reasons underlying the rule. That court then said:
"Thus, we believe that strict liability did not evolve simply because something was a product. The policy reasons brought it into being and continued to expand it. It is those reasons then that should determine what is a product and not that it was simply something resulting from production, or `produced naturally or as a result of a natural process,' the dictionary definition, or the meaning given in 72 C.J.S. Products at 1210 (1951) that defendant would have us accept: Anything produced, * * * as a result of * * * labor, or thought * * *.' Such definitions would exclude water, wood, all living things, and anything else that remains in the natural state at the time it is supplied or distributed. Significantly, whole blood which was found to be a product in Cunningham [v. MacNeal Memorial Hosp. (1970), 47 Ill.2d 443, 266 N.E.2d 897,] would also be excluded.
"We have considered those underlying policy reasons in their relation to the development of the strict products liability concept, and we have come to the conclusion that a building such as is involved here is not a product within the meaning of the use of that term in Sec. 402A.
"We have also taken into consideration in reaching this conclusion the fact that in Cox v. Shaffer (1973), 223 Pa.Super. 429, 302 A.2d 456, which appears to be the only case in the country involving the specific question, the court held, without stating any supporting reasons, that a silo constructed on a farmer's land was not a product within the meaning and intent of Sec. 402A. Additionally, we have considered the significance of a statement by the court in Greenman v. Yuba Power Products, Inc. (1963), 59 Cal.2d 57, 63-64, 27 Cal. Rptr. 697, 701, 377 P.2d 897, 901, the progenitor of the doctrine, that the purpose of strict liability is "to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves. Sales warranties serve this purpose fitfully at best. [Citation.]' (Emphasis added.) This statement not only articulated the purpose but also the court's reason or imposing strict liability. Sales warranties then could not adequately provide a remedy for injured plaintiffs, because the doctrines of privity and express disclaimers of warranty would bar recovery. At that time, the Greenman court believed that a judicial remedy should be provided, and it conceived that strict liability doctrine. In Illinois, because judicial remedies are presently available against those responsible for defective construction on negligence and *119 implied warranty theories, the reason expressed in Greenman does not appear to justify bringing a constructed building within the ambit of strict liability.
"Moreover, we believe that the framers did not originally contemplate a structure such as a building to be a product. This is evident (a) from the fact that although comment d lists a number of products within the purview of Sec 402A, it does not include buildings; and (b) because the liability of builders is described and articulated in other section of the Restatement, it appears to us that if structures and their builders were to be held to strict liability the framers of the Restatement would not have included the standard of care pertinent to builders, contractors and sellers of real property set forth in Subsections 353, 385 and comment e of 389.
"Plaintiff also contends, as she does with respect to the garage structure, that the parking spaces within it were in a defective and not reasonably safe condition. We believe, however, that our reasoning in holding that the garage was not a product as contemplated by Sec. 402A is equally applicable to the parking spaces which were part of the structure itself." Id., 8 Ill.Dec. at 552-53, 365 N.E.2d at 938-939
The Court of Appeals cited with approval Schipper v. Levitt & Sons Inc., supra, and its treating of the builders of hundreds of homes on the same basis as manufacturers of products sold in the stream of commerce because of their ability to shift the risk associated with defective products.
The Ohio Court of Appeals then said:
Dean Prosser and Professor Keeton note that the rules relating to strict liability of the housing merchant are inapplicable to the building contractor:
"The building contractor who, pursuant to a construction contract with an owner of land, constructs a hotel, office building, residence or other structure on owner's land, must be carefully distinguished from the real estate promoter or housing merchant who constructs residences and other buildings on his own land and sells or leases such dwellings and other structures to others. The transaction of the building contractor has generally been regarded as a transaction involving the rendition of a service even though the result of the service is to supply a structure or building to the owner. Therefore, the rules relating to strict liability of the housing merchant are inapplicable to the building contractor.
"The generally accepted view has not been to impose strict liability, either on a warranty or tort theory, to the building contractor who is regarded as being engaged primarily in the rendition of a service, i.e., the construction of a building on land owned by another pursuant to plans and specifications provided by the owner. Nevertheless, strict liability has been imposed on a building contractor on the theory that in essence the structure, which is completed and transmitted under the contract, is a product and sold within the meaning of a sale as contemplated by the rule for strict liability.

*120 "The ultimate answer to the question of strict liability should depend on whether or not the typical or paradigmatic building contractor is a sufficiently different type of enterpriser from the housing merchant to warrant a distinction being made between them as regards the subject of strict liability for defects attributable to (a) construction defects, (b) defects in products incorporated into the building, and (c) design defects of the structure." Prosser & Keeton, supra, at 724, Section 104A. Id., 8 Ill.Dec. at 553-554, 365 N.E.2d at 939-940
It concluded that a contractor who builds a building, or as in that case a swimming pool, in accordance with plans and specifications prepared by another for the owner should not be liable in strict liability in tort.
In Davis v. Henderlong Lumber Company, et al., 221 F. Supp. 129 (D.C.Ind. 1963), plaintiff, Davis ("Davis") sued for injuries sustained from inhaling toxic fumes in a chemical laboratory. He sued Henderlong Lumber Company and Arthur Henderlong, the general contractor, engaged by Davis' employer, Stanray Company ("Stanray"), a chemical company, to build the chemical laboratory. GC engaged as a subcontractor, Aafco Heating Co. ("Aafco") to install the hoods and exhaust fans to be installed in the chemical lavatory.
GC hired Douglas F. Haley, a licensed architect to prepare the plans and specifications for the building and the project.
Davis alleged that Aafco deviated from the plans prepared by Haley with approval of the GC or Haley by installing a larger hood and moving the exhaust system to go through a different wall and thereby the exhaust was no longer vertical increased the quantity of toxic fumes in the chemical laboratory. Aafco made the change on the verbal instructions of Theodore Pilet a Stanray employee.
Davis charged that Pilet had no authority to order the change and neither the GC nor Aafco had any right to rely upon such instructions. Davis further charged that as experienced contractors the GC and Aafco knew the nature and purpose of the apparatus which they were constructing and knew or should have known that such apparatus as constructed was wholly insufficient to exhaust the toxic chemicals.
*121 There was no dispute that Stanray accepted the chemical laboratory as built prior to the date of Davis' injury.
Defendants moved for summary judgment on the basis that all work done pertaining to the construction and installation of the hoods and exhaust system was done according to the plans and specifications furnished by Stanray. The defendants relied upon the depositions taken.
The court found that Stanray employed Pilet as a chemical engineer and its research manager. Pilet was in charge of the project. It further found that Pilet had done the drawings for the layout of the building and prepared the detailed plans and specifications for the hoods and exhaust system. Pilet then gave that work to Haley to copy and place his architect's seal on them so that they could be filed with the proper officials.
The court found that Pilet had directed the changes during installation. The court further found that the specifications for the apparatus did not amplify or specifically detail out the purpose which the exhaust fan was to do, nor did Pilet ever tell GC or Aafco what its purpose was.
The court also found that Stanray expected the GC and Aafco to install the equipment according to the specifications and directions of Pilet and that the hood and exhaust system were completed in accordance with Pilet's specifications.
The court found that Stanray had assigned Davis, as laboratory manager, the duty of checking out the laboratory equipment, including the hood and exhaust system, as to its effectiveness.
The court found that neither the personnel of the GC or Aafco had any education in chemistry or practical experience in building chemical laboratories although the GC group had 23 years of experience as general contractors and the Aafco personnel had over 12 years experience with sheet metal work.
The court reviewed the development of the law in Indiana concerning the liability of builders where there are defects in *122 the buildings they construct including the elimination of the requirement of privity. The court in citing Ryan v. Feeney & Sheehan Bldg. Co., 239 N.Y. 43, 145 N.E. 321 (Ct. of A.N.Y. 1924), then said:
The rule pronounced in the Ryan case, by the same court which earlier had decided MacPherson v. Buick, supra, was followed and cited approvingly by Judge Learned Hand in Person v. Cauldwell-Wingate Co., 2 Cir., 187 F.2d 832, cert. den. 341 U.S. 936, 71 S.Ct. 855, 95 L.Ed. 1364 (1951).
Thus, it was stated in Russell v. Arthur Whitcomb, Inc., 100 N.H. 171, 121 A.2d 781 (1956), that one important limitation on the rule placing building contractors on the same footing as sellers of goods, and holding them to the general standard of reasonable care for the protection of anyone who may foreseeably be endangered by their negligence even after acceptance of the work, is that the contractor is not liable if he has merely carried out the plans, specifications, and directions given him, since in that case the responsibility is assumed by the employer, at least when the plans are not so obviously dangerous that no reasonable man would follow them. (Emphasis supplied by court).
Insofar as Travis v. Rochester Bridge, 188 Ind. 79, 122 N.E. 1 (1919), is consistent with this rule, it is the law of Indiana, and the generally-accepted rule in other jurisdictions governing that question in the instant case. See Johnson v. San Leandro, 179 Cal. App.2d 794, 4 Cal. Rptr. 404; Tipton v. Clower, 67 N.M. 388, 356 P.2d 46; Garden of the Gods Village v. Hellman, 133 Colo. 286, 294 P.2d 597; Gordon Creek Tree Farms Inc. v. Layne, 230 Or. 204, 358 P.2d 1062, 368 P.2d 737; Leonard v. Abbott, Tex.Civ.App., 357 S.W.2d 778; Tooker v Lonky, 106 N.J.L. 110, 147 A. 445; Amann v. City of Tacoma, 170 Wash. 296, 16 P.2d 601. See also 58 A.L.R.2d 865; 57 C.J.S. Master and Servant Sec. 589; Rst. of Torts 404, Comment (a).
Having determined the applicable rule of liability, the final inquiry is whether or not the plans and specifications for the chemical fume hood and exhaust apparatus, with the subsequent modification made by Theodore J. Pilet, were so obviously or glaringly dangerous that a contractor with average skill and ordinary prudence would not have attempted the construction and installation according to the plans and directions of Pilet.
Summary judgment is not a substitute for trial but is rather a judicial search for determining whether genuine issues exist as to material facts. Homan Mfg. Co. v. Long, 242 F.2d 645 (C.A.7th, 1957).
The facts are clear and undisputed. The defendants had no prior experience with the construction of chemical laboratories and equipment, or with the manufacture, or use of chemicals. At no time were the defendants informed of the purpose of the chemical fume hood and exhaust apparatus. The defendants completed their contracts in the manner expected of them. Stanray Corporation still felt that the exhaust apparatus, with the subsequent modification ordered by their own chemical engineer and supervisor of the laboratory project should have been adequate. [221 F. Supp. at 134]

*123 ....
As mentioned above, the contractors in the instant case had neither the educational background or experience to question the plans submitted or modifications ordered by the supervising engineer, a chemist, whose judgment on those matters could justifiably be taken. [221 F. Supp. at 135]
The court granted summary judgment for the defendants.
Returning now to Justice Scalia's third requirement in the criteria for government contractors defense:
(3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.... that is appropriate where a manufacturer of a product is involved.
It is consistent with Justice Jacobs' decision in Schipper v. Levitt & Sons, Inc., supra, in holding that York Shipley, Inc. ("York") the manufacturer of the heating system installed by Levitt, which delivered hot water at the faucet with a temperature of 190 degrees, was not liable. The evidence showed that York did not supply the mixing valves to mix cold and hot water before the hot water was released at the faucet. But such valves were inexpensive and widely available in the market. In Levitt's negotiations with York, York's representatives told Levitt that mixing valves should be installed otherwise the hot water would be delivered at 190 degrees to 210 degrees and would be hazardous. Despite that advice, Levitt and its staff designer elected not to install mixing valves but put a note in the home buyers guide to turn on the cold water faucet before turning on the hot water faucet. Justice Jacobs concluded:
neither Levitt nor anyone else placed any reliance on York's judgment or skill in connection with the overall design of the system and its installation; that being so there would appear to be no sound basis for invoking principles of implied warranty or strict liability against York.... [Citations omitted] [44 N.J. at 97, 207 A.2d 314]
Based on the above cited authorities the court concludes that as against a claim by a third-party for personal injuries against an independent general contractor who or which constructs a building in accordance with plans and specifications supplied by a public entity, and over which the public entity and/or its professional architects and engineers retained control, there is a government contractor's defense if (1) the plans *124 and specifications were detailed; (2) the construction conformed to those plans and specifications; and (3) there were no glaring defects so out of the ordinary as to bring home to a contractor of average skill and of ordinary prudence that to follow them would likely cause injury.
The criteria just stated as adequate for a general contractor to be entitled to a contractor immunity defense in the revision developed by Justice Scalia that defense is predicated in part upon the known exercise of discretion by the Government.
Under the New Jersey Tort Claims Act, N.J.S.A. 59:9-1 immunity for public entities with respect to construction projects is provided for in N.J.S.A. 59:9-4-6 plan and design immunity and immunity for discretionary acts N.J.S.A. 59:2-3. Cf., Kolitch v. Lindedahl, 100 N.J. 485, 490, 497 A.2d 183 (1985); Berel Co. v. Sencit F/G McKinley Associates, 710 F. Supp. 530, 541-544 (D.C.N.J. 1989).
But since Clifton is not a third-party suing an independent contractor, the label of defense of the immunity of a governmental contractor is not relevant. Clifton is the contractee. DeGenaars is the contractor. Neither counsel nor the court has found a reported decision that has considered the problems presented.
However, the court concludes that the principles discussed in the authorities cited above do provide the answer. Clifton in it brief in opposition suggested that the motion was premature because Clifton has not deposed the officers of DeGenaars as to their knowledge of asbestos. For the reasons set forth below, this court disagrees that is necessary.
In terms of who had the power and responsibility to make the decision to use Kilnoise, Clifton's complaint and Rigolo's deposition make clear that Clifton and N.J.D.E. did together with Rigolo. The latter specifically specified Kilnoise for use in School No. 14.
*125 Based on Clifton's complaint as well as the other material before the court there is nothing to suggest that DeGenaars was involved in the decision process to use Kilnoise in School No. 14.
In those circumstances, based on Justice Jacob's decision in Schipper v. Levitt & Sons, Inc., supra, that there was no basis for liability as against York, there is no basis for liability up to the time of the award of the contract to DeGenaars.
Based on the holdings in Leininger v. Stearns-Roger Manufacturing Company, supra, Jackson, Administratrix v. City of Franklin, et al., supra, Davis v. Henderlong Lumber Company, supra, and the holding in the frequently cited decision in Ryan v. Feeney & Sheehan Mfg. Co., 239 N.Y. 43, 145 N.E. 321 (Ct. of A.N.Y. 1924), a contractor who takes the detailed plans and specifications from the owner has a right to rely upon the professional judgment and experience of those employed by the owner to develop those plans and specifications unless a review of those documents shows glaring defects that a contractor of average skill and of ordinary prudence would know that such defects would likely cause injury.
Clifton has not alleged in its complaint, or asserted in its brief, that DeGenaars did not perform its contract properly and fully in compliance with the plans and specifications Clifton furnished for the contractors of the area to bid on.
Clifton in its complaint alleges that 10 contracts were awarded work on its schools in the relevant period.
Judge Alterman stated the period to be starting sometime in the 1940's and running to 1962.
The record does not allow the court to fix the exact number of contractors who reviewed the ten sets of plans and specifications Clifton had prepared in that period. But Rigolo in his deposition stated that notice for the jobs was sent to the Dodge reports, a recognized construction industry publication, to disseminate news of new construction work being considered. In *126 addition there had to be published notice of the invitations to bid.
Clifton has neither alleged nor asserted that based on its experience, or that of the NJDE, any contractor called attention to a "glaring defect" in the plans and specifications because Kilnoise was specified. Nor has Clifton either alleged or asserted that any contractor in that period refused to submit a bid for that reason.
This court concludes that Clifton has the burden of proof on that issue if it is to hold DeGenaars liable, just as the third-party plaintiff whose husband was killed when a canopy collapsed on a U.S. Army Quartermaster Building in Ryan v. Feeney & Sheehan. There the Army had the plans and specifications prepared by architects and engineers who specified the type of supports for the canopy, the angles at which they were to be placed, and the distance between them. After the tragic event, the plaintiff's expert engineer testified to the defect appearing on the plans and specifications. As explained above, the Court of Appeals held that the existence of the defect was not the question if the contractor was to be held liable for it had no discretion but to follow the contract. The question was whether they were glaring defects to a contractor of average skill and of ordinary prudence such to bring home notice of the defect such that to perform them would likely cause harm.
To meet that burden, Clifton would have to repudiate the very plans and specifications it invited the contractors to bid on.
Turning to other points. The affidavit of Robert J. DeGenaars ("Robert") shows that he is a co-owner since 1975 and Secretary of DeGenaars.
He states DeGenaars has been in the contracting business since the 1940's.
3. DeGenaars never sold any asbestos containing products.
....
5. I was not involved in the construction of Clifton School No. 14 in 1952 and 1953. However, I can state with certainty that DeGenaars as general contractor of that building, would have fully complied with all plans and specifications *127 provided to it by the architect, including the installation of any asbestos-containing products, provided to it by the architect. Further, DeGenaars would have followed any any all directions given by the Clifton Board of Education and its representatives, with respect to the construction of the building.
There is no affidavit or certification to contradict those statements.
The court recognizes that Robert became co-owner in 1975. The affidavit is not based on personal knowledge, but as Secretary he would have access to the business records. In the absence of anything to contradict them, the court does accept them.
As pointed out in the cases cited when a general contractor performs its contract with the owner who has provided detailed plans and specifications and control over them such that the general contractor has no discretion, the law regards the general contractor as rendering a service and not the seller of goods or products being incorporated in the building; hence, there is no basis for express warranty, implied warranty, or strict liability in tort. Those are applications of law that stem from the contractual relationships of the parties about which there is no dispute.
Based on Clifton's allegation in its FIFTH CAUSE OF ACTION that based on advertisements concerning the safe use of the asbestos product in schools and said product was safe to use in public schools and would require no attention or special precautions, that when Clifton purchased the asbestos product it relied upon the skill and judgment of the defendants and the express warranties of the defendants, but in fact said representation and warranties were not true, the court concludes that Clifton is pleading that it and the public did not know of the danger of asbestos when its schools were built.
The only defendants that can be covered by those allegations are those which produced and circulated literature and placed advertisements in the media about the asbestos product. Those persons are the manufacturers and distributors of such products.
*128 The only basis to deny the motion for summary judgment would be to state that DeGenaars had a duty to inspect a product specified by Clifton, which Clifton believed was safe, to detect for unknown dangers. For the reasons stated in Leininger, supra, and in Davis, supra, the court concludes that DeGenaars had no such duty. If any one had that duty either Clifton or the professionals whom it hired had that duty and DeGenaars had the right to rely upon what Clifton invited it to bid on and be required to furnish.
Because the court concludes that DeGenaars had no duty to investigate the products selected and specified by Clifton to use in its schools over a 20 year period, the court concludes that there is no need to consider DeGenaars contentions based on equitable estoppel.
This is also consistent with the concept of fairness discussed in Vanchieri, supra.
Finally for the reasons set forth by Judge Alterman, Clifton is not left without remedy against a financially responsible party or parties.
The court notes that copies of DeGenaars' motion for summary judgment and all subsequent papers filed by DeGenaars were served on other counsel of record. Certification of McDonald dated March 31, 1992. Except for Clifton's brief in opposition no other party filed any papers in opposition.
The court grants DeGenaars motion for summary judgment.