211 N.J. Super. 196 (1986)
511 A.2d 690
CHRISTINE MCDERMOTT, GENERAL ADMINISTRATRIX AND ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF MICHAEL MCDERMOTT, AND CHRISTINE MCDERMOTT, AS PARENT AND GUARDIAN OF INFANT MICHELLE MCDERMOTT, AND CHRISTINE MCDERMOTT, INDIVIDUALLY, PLAINTIFF-APPELLANT,
v.
TENDUN CONSTRUCTORS, ROHR INDUSTRIES, INC., ROHR INDUSTRIAL SYSTEMS, INC., ROHR CORPORATION, UNDERHILL CONSTRUCTION COMPANY, E.C. ERNST, INC., TERMINAL CONSTRUCTION COMPANY, DIC CONCRETE CORPORATION, NAGER ELECTRIC CO., INC., CONTROLMATION SYSTEMS, INC., AND LESTER B. KNIGHT AND ASSOCIATES, INC., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 20, 1986.
Decided June 17, 1986.
*199 Before Judges MICHELS, GAULKIN and STERN.
Milton D. Liebowitz argued the cause for appellant Christine McDermott (Liebowitz & Liebowitz, attorneys; Milton D. Liebowitz, of counsel and on the brief).
Richard J. Laiks argued the cause for respondents Tendun Constructors and Nager Electric Co., Inc. (Heller & Laiks, attorneys; Richard J. Laiks, of counsel and on the letter brief).
David J. Kenny argued the cause for respondent Lester B. Knight and Associates, Inc. (Schragger, Schragger & Lavine, attorneys; David J. Kenny, of counsel and on the brief).
Robert S. Bonney, Jr. argued the cause for respondents Rohr Industries, Inc., Rohr Industrial Systems, Inc. and Rohr Corporation (Evans, Koelzer, Osborne & Kreizman, attorneys; Robert S. Bonney, Jr., of counsel and on the brief).
Robert T. Hueston argued the cause for respondent E.C. Ernst, Inc. (Hueston, Hueston & Sheehan, attorneys; Robert T. Hueston, of counsel and on the letter brief).
*200 Amy L. Wizda argued the cause for respondent Terminal Construction Company (Tolstoi & Tolstoi, attorneys; Maureen Lepochat, of counsel and on the brief).
John J. Scanlon argued the cause for respondent DIC Concrete Corporation (Scanlon & Robinson, attorneys).
Eugene J. McDonald, attorney for respondent Underhill Construction Company.
Archer & Greiner, attorneys for respondent Controlmation Systems, Inc.
The opinion of the court was delivered by MICHELS, P.J.A.D.
Plaintiff Christine McDermott, as General Administratrix and Administratrix ad prosequendum of the Estate of Michael McDermott, and Christine McDermott, as parent and guardian of infant Michelle McDermott, and Christine McDermott, individually, appeals from a summary judgment of the Law Division entered in favor of defendants and third-party defendants: (1) TENDUN Constructors (TENDUN); (2) Terminal Construction Corporation (Terminal); (3) E.C. Ernst, Inc. (Ernst); (4) Nager Electric Co., Inc. (Nager); (5) DIC Concrete Corporation (DIC); (6) Underhill Construction Co. (Underhill); (7) Rohr Corporation a/k/a Rohr Industries, Inc., Rohr Plessey Motor Development Corporation, Rohr Plessey Corporation a/k/a Rohr Industrial Systems, Inc., Plessey Dynamics Corp., Plessey North America Corp., Plessey Company Limited (collectively referred to as Rohr); (8) Controlmation Systems, Inc. (Controlmation); and (9) Lester B. Knight and Associates, Inc. (Knight), which dismissed plaintiff's complaint, as well as all crossclaims, counterclaims, claims for indemnification and third-party complaints with prejudice in this wrongful death and survival product liability action.
Plaintiff instituted this action, grounded on claims of negligence, breach of warranty and strict liability in tort, against TENDUN, a joint venture consisting of contractor defendants *201 Terminal, Ernst, Nager, DIC and Underhill; Rohr, TENDUN's subcontractor and Knight, an architectural design firm. The suit arose from an accident at the New York Bulk and Foreign Mail Center (NYB & FMC) in Secaucus, New Jersey in which plaintiff's husband, Michael McDermott (decedent) was killed on December 15, 1979. At the time of the accident decedent, a mail handler at the NYB & FMC, was using an extendable conveyor that had been rolled into the trailer portion of a tractor-trailer. This conveyor was being used to convey parcel mail to decedent which he was to stack inside the truck.
When discovered by co-workers, decedent was found with his head partially under the head-end of the conveyor, which was located inside the trailer, with his legs pointing into the truck, away from the conveyor. It was later ascertained by the medical examiner that decedent's death had been caused by multiple skull fractures, with subdural hematoma, and multiple rib fractures with internal bleeding. As a result of her husband's death, plaintiff instituted this action against the above-named parties who were believed to be involved in the design, development and/or manufacturer of the conveyor during the construction of the NYB & FMC facility in the 1970's.
The record submitted in connection with this appeal reveals that on September 17, 1969, the United States Post Office Department (POD) entered into a contract with defendant Knight, an architectural firm, with respect to the construction of the NYB & FMC facility. Pursuant to the terms of this contract, Knight was to develop "new and improved engineering concepts and plans for mechanized mail processing systems in the New York Metropolitan Area." The contract further specifically provided that Knight was to:
furnish all engineering and other services and materials necessary for the development of a mail processing system concept for the two [planned] facilities, including the preparation of the specifications for the facilities and the mechanization to be used for mail processing. These specifications [were to] conform to best industrial practices and [were to] be adequate to permit the solicitation of bids for construction of the facilities and the procurement of the mail processing equipment to be used therein. [Emphasis supplied].
*202 Pursuant to its contract with the POD, Knight thereafter prepared a bid package which was submitted to and approved by the POD. In developing this bid package, Knight prepared specifications and drawings which, pursuant to the terms of its contract with the POD:
ma[d]e use of existing POD standard components, drawings, design details and drawing practices to the extent that they [were] consistent with [its] overall plan for the design of these systems and [did] not interfere with [its] freedom to provide a functional system design in accordance with standard industrial practices. [Emphasis supplied].
Upon approving the bid package prepared by Knight, the POD entered into an inter-agency agreement with the United States Army Corps of Engineers (Corps). Pursuant to this contract, the Corps was to solicit bids, award contracts for and supervise the construction of the NYB & FMC. Accordingly, the Corps presented the bid package, prepared by Knight, to prospective contractors and, in May 1971, a contract for the construction of the NYB & FMC was awarded to TENDUN. Pursuant to the terms of the contract between TENDUN and the U.S. Government, TENDUN was to "perform [its] contract in strict accordance with the General Provisions and the ... designated specifications, schedules, drawings, and conditions...."
On July 23, 1971, TENDUN, as general-contractor, entered into a subcontract with Rohr for the fabrication of extendable conveyors to be used within the NYB & FMC facility. This contract included the fabrication of the conveyor with which decedent was working on the date of his death. This contract specifically required that Rohr "design, furnish and deliver ... all of the mechanization equipment ... in strict accordance with all of the Proposal Documents, Technical Provisions, Addenda, Amendments and Drawings, hereinafter referred to as `The Contract Documents,' all as prepared by Lester B. Knight and Associates, Inc.... and the Department of the U.S. Army, Corps of Engineers...."
*203 Pursuant to these contract requirements, Rohr prepared layout shop drawings from the plans and specifications contained in the bid package. In doing this, Rohr utilized the design drawings and written specifications which had been prepared by Knight, in order to achieve a single shop drawing which graphically depicted the extendable conveyor and incorporated all details contained on the multiple contract documents. Once completed, these layout drawings were submitted to both Knight and the Corps for approval, since Knight was contractually bound to serve as consultant to the Corps throughout the duration of the construction project. It is not disputed that, ultimately, shop drawings prepared by Rohr, based upon Knight's design specifications, were approved for fabrication.
In initiating the fabrication of these extendable conveyors, Rohr prepared a pre-production model for inspection by TENDUN, the Corps and Knight. This model was visually inspected and put through operational testing in order to determine whether the conveyor complied with applicable plans and specifications. Following this and other such inspections, Rohr was provided with a series of punch-list deficiencies, which it corrected in order to bring the conveyor into compliance with contract plans and specifications. Thereafter, Rohr's subcontractor for fabrication, BRO-CON (a defunct non-party), completed production of all extendable conveyors which were required at the NYB & FMC and delivered them to the facility.
During these pre-production inspections, the "stop and go" control for the model extendable conveyor, which had been manufactured by Controlmation, was temporarily mounted on the machine, with clamps, in a location generally designated in the specifications prepared by Knight. According to these Sack Handling Systems Specifications, each extendable conveyor at the NYB & FMC was to be controlled "from a control station at the head end of the conveyor." During a pre-delivery inspection, Charles Schroer, the area engineer and resident contracting officer for the Corps, specifically directed where the push-button controls ultimately were to be permanently placed. Accordingly, *204 at the time the completed conveyors were installed at the NYB & FMC facility, the controls were affixed at the location designated by the Corps representative. There is no dispute that, when the conveyors were turned over to the POD, they were in full compliance with the contractual plans and specifications which had been prepared by Knight and approved and adopted by the POD.
Following decedent's death and the filing of plaintiff's complaint in July 1979, there followed two and one-half years of extensive discovery by all parties. Following the conclusion of discovery, all defendants moved for summary judgment. On December 22, 1983, the trial court granted summary judgment in favor of all defendants except Knight, dismissing all direct claims, crossclaims and third-party claims as to these parties. The summary judgment was thereafter certified as final, pursuant to R. 4:42-2. Both plaintiff and Knight appealed and, in an unpublished opinion filed December 18, 1984, we remanded the case for further proceedings, noting that we were "seriously disadvantaged by the failure of the trial judge to give ... any finding or conclusions in support of his order." McDermott v. Lester B. Knight and Associates, Inc. (Docket Nos. A-2823-82T2 and A-2455-83T2).
On remand, following argument, Judge Longhi in the Law Division granted summary judgment in favor of all defendants and third-party defendants and against plaintiff, dismissing the complaints, cross-claims, third-party complaints and claims for indemnification with prejudice. The summary judgment as to all defendants, except Knight, was granted on the ground that these defendants were entitled to governmental immunity. The trial court denied Knight's motion for summary judgment on this ground, reasoning that it was Knight who essentially prepared the allegedly defective plans and specifications for the POD.
The trial court, however, additionally determined that summary judgment should be granted as to Knight, on the alternate *205 ground that plaintiff had failed to make a prima facie showing, based upon competent expert testimony, that there was any design defect in the extendable conveyor. In rendering this decision, the trial court specifically concluded:
that the record to date does not show and cannot show that there was some deviation or some defect in the plans and specifications ... as drawn by Lester B. Knight; or that there was ... a design defect ... at the time that [the extendable conveyor] left any of the manufacturers.
Plaintiff now again appeals the summary judgment as to all defendants, while Knight has challenged the denial of summary judgment as to it on the issue of governmental immunity.
We are convinced from our study of the record, in light of the arguments presented, that summary judgment was properly granted by the trial court. Summary judgment is a stringent remedy and should not be granted unless the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. R. 4:46-2. The moving party's burden in this regard is to exclude any reasonable doubt as to the existence of any genuine issue of material fact. All inferences of doubt are drawn against the moving party in favor of the opponent of the motion. Thus, the papers supporting the motion are closely scrutinized and the opposing papers indulgently treated. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 74-75 (1954). See also Brenner and Co. v. Perl, 72 N.J. Super. 160, 166 (App.Div. 1962).
If there is the slightest doubt as to the existence of a material issue of fact, the motion must be denied. Linn v. Rand, 140 N.J. Super. 212, 216 (App.Div. 1976). See also United Advertising Corp. v. Metuchen, 35 N.J. 193, 195-196 (1961). Thus, in Ruvolo v. American Casualty Co., 39 N.J. 490 (1963), our Supreme Court summarized the standard governing the grant or denial of summary judgment, commenting:
It is a matter of common knowledge that such judgments are to be granted with extreme caution. The moving papers and the pleadings are to be considered most favorably to the party opposing the motion. All doubts are to be *206 resolved against the movant. It has been said on the federal scene (after whose rule our own is patterned) that a litigant has the right to trial where there is the slightest doubt as to the facts. Peckham v. Ronrico Corp., 171 F.2d 653, 657 (1 Cir.1948); Doehler Metal Furniture Co. v. United States, 149 F.2d 130, 135 (2 Cir.1945). If there is such a doubt it cannot be said the movant's case is unequivocally established or that palpably there is no genuine issue as to any material fact challenged. (Citation omitted). [Id. 39 N.J. at 499].
Considering the case in this light, we are satisfied that the trial court properly determined that all defendants, with the exception of Knight, excluded all reasonable doubt as to their entitlement to governmental immunity since it is clear that they were contractually bound to and did, in fact, complete their work in strict compliance with relevant contractual plans and specifications. This court has recognized that, in a products liability action, where a defendant has had no discretion and has "strictly adhered to the plans and specifications owned and provided by the Government," there can be no liability imposed. Sanner v. Ford Motor Co., 154 N.J. Super. 407, 409 (App.Div. 1977), certif. den., 75 N.J. 616 (1978).
This extension of governmental immunity is necessary in light of both the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 et seq., and the Federal Tort Claims Act, 28 U.S.C.A. § 2680(a), which respectively insulate State and Federal governmental entities from liability for discretionary activities. As we concluded in Cobb v. Waddington, 154 N.J. Super. 11 (App.Div. 1977), certif. den., 76 N.J. 235 (1978):
The statutory immunity would be meaningless if a public entity's contractor which follows government specifications were held to the liability from which the public entity is shielded. Under these circumstances the contractor enjoys the same protection. (Citation omitted) [154 N.J. Super. at 18].
See also Rodriguez v. N.J. Sports & Exposition Authority, 193 N.J. Super. 39, 45 (App.Div. 1983), certif. den., 96 N.J. 291 (1984) (public contractor is not liable for work done in accordance with plans and specifications furnished by a public entity and performed under its guidance and supervision).
Here, there was no proof whatsoever presented to create a factual issue as to whether any of the defendants, other than Knight, failed to strictly comply with either the terms of their *207 contracts or the directions and orders issued by the government through its engineering consultant, the Corps. Accordingly, we hold to the view that the trial court properly granted summary judgment as to all defendants, except Knight.
With respect to Knight, we conclude that summary judgment grounded upon governmental immunity was properly denied since the record clearly indicates that this entity was fully responsible for planning and designing all aspects of the NYB & FMC facility, including the extendable conveyors. Although Knight's contract specified that it was to employ "existing POD standard components, drawings, design details and drawing practices" where practical, it is equally clear that these specifications were not to "interfere with its freedom to provide a functional system design in accordance with standard industrial practices."
Accordingly, in developing its designs for the NYB & FMC, Knight was not strictly bound by government specifications or demands. Indeed, the Sack Handling Systems Specifications utilized in the production of the extendable conveyors did not exist until Knight created them. It has been recognized that to rely on a "government contract defense," the obligation from which a defendant seeks immunity must have been contained within the contract which was executed with the government. Merritt, Chapman & Scott Corp. v. Guy F. Atkinson Co., 295 F.2d 14, 15 (9th Cir.1961). However, where, as here, the record reveals no evidence that a defendant was required by any governmental directive to do that which was charged against it, the "government contract defense" is unavailable. Id. at 16. See also McKay v. Rockwell International Corp., 704 F.2d 444, 450 (9th Cir.1983), cert. den., 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984) (when only minimal or very general requirements are set forth by the United States contract, the government contractor defense is inapplicable).
Although Knight clearly was not entitled to summary judgment based upon governmental immunity, we find that the trial *208 court properly granted it summary judgment on the alternate ground that plaintiff had failed to make a prima facie showing, based on competent expert testimony, that there was any design defect in the extendable conveyors which Knight designed. The only evidence of alleged defective design was presented by plaintiff's engineering expert, Seymour S. Bodner, P.E. (Bodner). In his written report Bodner concluded that:
the subject conveyor # 23, as configured at the time of the accident, did not conform to the accepted safety standards for such equipment. The accident which occurred at the inrunning nip between the conveyor belt and the snub roll resulted from the failure to install the correct guarding devices for the conveyor's hazards and from the location of the operator's control in a position not readily accessible to the operator's working position at the head end of the conveyor and adjacent to the non-protected inrunning nip. [Emphasis supplied].
However, this evidence is clearly insufficient to support a finding that a design defect existed at the time the extendable conveyors were fabricated and turned over to the POD.
In a design defect case, such as this, plaintiff must prove that: (1) the product was defective; (2) the defect was in existence at the time the product left defendant's control; and (3) the defect caused a reasonably foreseeable user to suffer injury. O'Brien v. Muskin Corp., 94 N.J. 169, 179 (1983); Michalko v. Cooke Color & Chemical Corp., 91 N.J. 386, 394 (1982).
Proof that the product was defective requires more than a mere showing that the product caused the injury. The necessity of proving a defect in the product as part of the plaintiff's prima facie case distinguishes strict from absolute liability, and thus prevents the manufacturer from also becoming the insurer of a product. [O'Brien v. Muskin Corp., supra, 94 N.J. at 179-180 (Emphasis supplied)].
Therefore, in a design defect case, plaintiff clearly bears the burden of producing evidence that the product contained a defect.
In this matter, plaintiff's expert apparently was of the opinion that the design defect in the extendable conveyor was twofold in that it: (1) lacked adequate guarding devices; and (2) was operated by controls which were not readily accessible. In *209 considering the sufficiency of the first contention, it must initially be noted that Bodner's expert opinion focused upon the adequacy of the extendable conveyor's guarding on the day of the accident, rather than at the time it was manufactured.
This improper focus is evidenced by repeated references in Bodner's written expert report to the machine's configuration "at the time of the accident," as well as by his deposition testimony. While being deposed, Bodner explained that:
[he] was merely retained to do an engineering evaluation of the conveyor as it existed and the adequacy of the guarding and safety of that conveyor at the time of the accident. [Emphasis supplied].
The improper focus of Bodner's observations is further evidenced by the fact that he never reviewed the original specifications for mechanized equipment at the NYB & FMC facility. In explaining why he had not reviewed these documents before rendering his opinion, Bodner stated that "[t]hey [were] not relevant as far as [his] assignment [was] concerned," since his function was simply to render an opinion as to whether, at the time of the accident, the machine was safe.
Having made these observations, we next note that, as specified in the Sack Handling Systems Specifications, the extendable conveyors were to have "[e]nclosures and guards ... installed in the locations shown on the drawings and as specified." Accordingly, as designed and fabricated the in-running nip point and moving parts at the lower end snub roller and conveyor belt were guarded to prevent accidental employee contact. However, by the time of decedent's accident, it was uncontroverted that this area of the conveyor was not guarded due to the removal of the electrically interlocked bumper guard which was located at the head end of the conveyor at the time the machinery was installed at the NYB & FMC facility.
It was the uncontroverted opinion of Knight's engineering expert, O'Brien-Kreitzberg & Associates, Inc. that:

*210 [a]s initially installed, this interlock bumper guard would have prevented any access by employees to the hazard of being drawn into the in-running nip point located on the conveyor's underside.

* * * * * * * *
[However, m]aintenance failures over the six years during which conveyor SR-23D was operated resulted in the electrically interlocked bumper guard located at the head end of the conveyor to be removed without replacement. This resulted in an additional area of entry to the in-running nip point located on the conveyor's underside. [Emphasis supplied].
In view of the fact that the conveyor, as designed, contained a safety guard which was removed by the POD, plaintiff's allegations with respect to this design defect are irrelevant, with reference to the design of the conveyor unless, at the time of design and fabrication, it was foreseeable that such a removal would occur.
The Supreme Court has recognized that an unforeseeable misuse of a product may not give rise to strict liability. Suter v. San Angelo Foundry & Machine Co., 81 N.J. 150, 159 (1979); Cepeda v. Cumberland Engineering Co., 76 N.J. 152, 177-178 (1978). However,
[w]hile strict products liability attaches when the product, shown to be defective, has been used for its intended purposes as originally designed, ... a manufacturer can also be held liable under strict liability principles for design defects if it is objectively foreseeable that a substantial change in the product will cause injury. [Brown v. United States Stove Co., 98 N.J. 155, 165-166 (1984) (Emphasis supplied)].
While a change in any product may be viewed as material or significant from a design or operational standpoint, it is not deemed to be "substantial" for strict liability purposes unless the change is related to the safety of the product. Soler v. Castmaster, Div. of H.P.M. Corp., 98 N.J. 137, 148 (1984). "A substantial alteration is one that involves not only a material change in the design or function of the product but also affects the risk of danger in its use." Ibid.
Thus, in the event of either a substantial alteration or misuse, the manufacturer will be responsible for resultant injuries to an operator if the alteration or *211 misuse implicated in the actual use of the machine was foreseeable and could have been prevented or reduced. ... [Id. at 151 (Emphasis supplied)].
In this case, an electrically interlocking bumper device was installed as a safety guard on the extendable conveyors fabricated for the POD. Plaintiff has provided no evidence that it was reasonably foreseeable that such guarding would be removed once the conveyors were installed at the NYB & FMC facility. It is only when such a factual issue exists that "a determination of objective foreseeability that substantial change or misuse will occur" becomes a jury question. Brown v. United States Stove Co., supra, 98 N.J. at 169. It was, therefore, clearly "plaintiff's burden to demonstrate that it was objectively foreseeable that the subsequent substantial alteration or misuse of the product would create the risk of ... injury." Ibid. Since such evidence was indisputably lacking here, the trial court properly granted summary judgment as to this alleged defect, since the design of the conveyor clearly conformed to the applicable specifications.
Plaintiff's allegations of design defect, however, were not based on the inadequacy of this guarding alone. Her expert additionally opined that, notwithstanding the original placement of the horizontal bumper bar at the head end of the conveyor, additional protective guarding was also necessary on the right side of the conveyor. In proffering this opinion, Bodner asserted that "at the time of the accident" the subject conveyor did not conform to accepted safety standards.
Once again, however, it must be noted that plaintiff's expert's observations with respect to the condition of the conveyor at the time of the subject accident are irrelevant with respect to the issue of design defect. Accordingly, plaintiff presented no proof by virtue of expert evidence or otherwise that the presence or absence of side guarding was a design defect which existed when the subject extendable conveyor was fabricated. On the other hand, the deposition testimony of Charles Schroer, the resident Corps engineer at the NYB & FMC facility, indicated *212 that such guarding would not have been practical on a extendable conveyor.
Since plaintiff clearly has not met her burden of proving that a side guard design defect existed at the time the extendable conveyor was fabricated, see O'Brien v. Muskin Corp., supra, 94 N.J. at 179; Michalko v. Cooke Color & Chemical Corp., supra, 91 N.J. at 394 the trial court also properly found that plaintiff had raised no genuine issue of material fact with respect to this alleged guard design defect.
Plaintiff's expert finally noted that, after the subject incident, mushroom shaped "stop and go" buttons were placed directly behind the head end pulley on the extendable conveyors. Such buttons were not included on the original conveyor design, leading Bodner to conclude that the machines were defectively designed since the controls, as originally placed, were not positioned in a location which was readily accessible to the operator's working position.
With respect to this allegation concerning the location of the "stop and go" control buttons, it must merely be reemphasized that uncontroverted pretrial discovery revealed that these controls were placed on the conveyors at the position specifically designated by Charles Schroer, the resident engineer with the Corps. Since the exact location of the controls was expressly chosen and designated by a governmental entity, if such placement is considered to be improper, the responsibility must lie with the Army Corps of Engineers, who would clearly be entitled to governmental immunity for such an action.
In conclusion, we are satisfied that defendants have adequately excluded all reasonable doubt as to the existence of the material factual issues discussed herein. Accordingly, the trial court was not precluded from granting summary judgment and the summary judgment entered as to all defendants, therefore, is affirmed.