Walter ANDREW, Plaintiff,

v.

UNISYS CORPORATION, Successor
to Burroughs Corporation,
Defendant.

Dennis BEALL, Plaintiff,

v.

UNISYS CORPORATION, Successor
to Burroughs Corporation,
Defendant.

Sandra K. BEALL, Plaintiff,

v.

UNISYS CORPORATION, Successor
to Burroughs Corporation,
Defendant.

Terry HILLMAN, Plaintiff,

v.

UNISYS CORPORATION, Successor
to Burroughs Corporation,
Defendant.

Janet JONES, Plaintiff,

v.

UNISYS CORPORATION, Successor
to Burroughs Corporation,
Defendant.

Linda JORAY, Plaintiff,

v.

UNISYS CORPORATION, Successor
to Burroughs Corporation,
Defendant.

Francine ROBINSON, Plaintiff,

v.

UNISYS CORPORATION, Successor
to Burroughs Corporation,
Defendant.

David SITTER, Plaintiff,

v.

UNISYS CORPORATION, Successor
to Burroughs Corporation,
Defendant.

Ruth I. WILDER, Plaintiff,

v.

UNISYS CORPORATION, Successor
to Burroughs Corporation,
Defendant.

Nos. CIV–95–618–R, CIV–95–619–R, CIV–95–620–R, CIV–95–621–R, CIV–95–622–R, CIV–95–623–R, CIV–95–624–R, CIV–95–625–R and CIV–95–626–R.

United States District Court,
W.D. Oklahoma.

May 7, 1996.

Larry A. Tawwater, Steven R. Davis, McCaffrey & Tawwater, Oklahoma City, OK, Walter Andrew.

Richard C. Ford, Andrew M. Coats, Crowe & Dunlevy, Oklahoma City, OK, Unisys Corporation.

## ORDER

DAVID L. RUSSELL, Chief Judge.

Before the Court is the Motion for Summary Judgment filed by Defendant Unisys Corporation asserting the government contractor defense.

The Plaintiffs are employees of the United States Postal Service. Each of the Plaintiffs alleges that he or she has suffered repetitive stress injuries from the use of a multiple position letter sorting machine manufactured and sold by Defendant Unisys to the United States Postal Service. The Plaintiffs seek damages under tort theories of manufacturer's products liability and negligence, as well as breach of implied and express warranties. (See Complaint, pp. 1–2). Defendant Unisys moves for summary judgment pursuant to Rule 56, Fed.R.Civ.Pro. based on the government contractor defense.

### I. *Summary of the Evidence*

The automatic letter-sorting machine which is the subject of this suit is approximately 77 feet long and nine feet high, and consists of twelve consoles where postal employees use two ten-key piano style keyboards arranged in tiers. (See "Specifications for Manufacture, Installation, Etc. of Multi–Position Letter Sorting Machines Models No. 120 and 121;" hereinafter "120/121 Specifications.") As the machine conveys pieces of mail past the operator console, the operator reads the zip code and keys a code on the keyboards. (See 120/121 Specifications, §§ 3.9, 3.10). The machine's tracking system then reacts to the codes and directs the letter to the proper sorting bin located on the other side of the machine.

According to the Defendant's evidence, the United States Postal Service initiated the development of the Multi–Position Letter Sorting Machine, commonly referred to as the "MPLSM" in 1956 through a National Bureau of Standards contract with Rabinow Engineering Company, a private entity unrelated to the Defendant. (See Summary Technical Report 2235, United States Department of Commerce, Bureau of Standards, dated April 1958. See also Affidavit of Harold W. Lieske, August 16, 1995). Pursuant to the contract, Rabinow designed and built a full-scale pilot model of the MPLSM, which was installed in the United States Postal Laboratory in Washington, D.C. (See Lieske Affidavit, par. 2; Affidavit of C. Warren Hurley, August 4, 1995). Rabinow also created design and engineering drawings for the model, which it provided to the Postal Service. (Lieske Affidavit, par. 2).

The Postal Service subjected the model to extensive testing by its engineers and human factors specialists to verify the operational capabilities of Rabinow's design. The Postal

Service also reviewed in detail Rabinow's engineering drawings to determine compliance with Postal Service requirements. (See Hurley Affidavit par. 3; Lieske Affidavit par. 3). After this testing and evaluation, the Postal Service made several modifications to the Rabinow design, including noise reduction and a repositioning of the keyboard to improve operator access. (Lieske Affidavit, par. 3).

In 1958, the Postal Service awarded a research and development contract to Burroughs to build ten prototypes of the Rabinow MPLSM design. (See Post Office Department[1] information release dated October 13, 1959). The contract did not permit any fundamental change in the Rabinow design. The Postal Service provided Burroughs with the Rabinow design drawings and "rigid postal specifications." Any design changes, including the design for the keyboards, were to be made only at the direction of Postal Service authorities. (Hurley Affidavit, par. 6; Lieske Affidavit, par. 4).

During this development phase, Postal Service and Burroughs personnel, including human factors specialists, met extensively to discuss potential design improvements to the Rabinow model. (Affidavit of A. Finley France, December 12, 1994, par. 3). Postal Service and Burroughs personnel engaged in an active exchange of information and ideas. Burroughs engineers visited the Postal Service Laboratory in Washington, D.C., where they exchanged technical ideas and concepts with Postal Service employees. (France Affidavit, par. 3).

The completed Burroughs prototypes were first installed in post offices in Flint and Detroit, Michigan and in Washington, D.C. in 1959. (Lieske Affidavit, par. 4; Hurley Affidavit, par. 6, France Affidavit, par. 4). Postal Service personnel observed and evaluated the prototypes during operation. In addition, Postal Service officials inspected each prototype to determine compliance with criteria developed by the postal laboratory and

the postal service's human factors engineers. (Hurley Affidavit, par. 7; Lieske Affidavit, par. 6; France Affidavit, par. 4). Corrections were made to prototypes which did not meet criteria. The Postal Service ultimately accepted all ten Burroughs prototypes as conforming in all material respects to postal service requirements. (Hurley Affidavit, par. 7; Lieske Affidavit, par. 6).

After four years of review and evaluation, including human factors analyses, the postal service developed and drafted a comprehensive and detailed set of production drawings and specifications for the MPLSM in 1963. (Hurley Affidavit, par. 8; Lieske Affidavit, pars. 7, 8). These included keyboard and speed control specifications that detailed the design and materials of the keyboard, the shape of the keyboard, the tension, triggering pressure, stroke distance and spacing of the keys, the actuating pressure and the range of operating speeds. (Affidavit of Max Okun, September 26, 1995, par. 5; Hurley Affidavit, par. 8; Lieske Affidavit, pars. 7, 8). The Postal Service Bureau of Research and Development also prepared a detailed Engineering Handbook for the MPLSMs that specified the appropriate key pressure. Postal Service representatives signed and approved each MPLSM drawing, and used these detailed production drawings and specifications to competitively bid future contracts. for the mass production of MPLSMs. (Hurley Affidavit, par. 8; Lieske Affidavit, pars. 7, 8).

The first MPLSM production contract was awarded to Burroughs in 1964 for the manufacture of 26 of the original model MPLSMs, designated as Model 120/121. (Lieske Affidavit, par. 9; Okun Affidavit, par. 4; Vogel Affidavit, par. 4). The contract called for the machines to be built pursuant to Postal Service "build to print" detailed drawings and specifications. The Postal Service nameplate or logo was affixed to the bottom right corner of each MPLSM drawing. (Okun Affidavit, par. 4, Vogel Affidavit, par. 4).

---

1.  At the time the first MPLSMs were developed, the United States Postal Service was known as the Post Office Department. For consistency the Court uses the. term "Postal Service" in this Order to refer to both the United States Postal Service and its predecessor the Post Office Department.

The Postal Service required that the Model 120/121 MPLSM be manufactured "strictly in accordance" with its specifications. (See 120/121 Specifications § 3.11.2 "physical design and construction of machine parts, components and assemblies shall be in strict accordance with the drawings and specifications"; § 3.12.3 "detailed drawings, figured dimensions, tolerances, manufacturing notes, material specifications, surface finish and heat treatment requirements shall be followed. All parts shall be manufactured strictly in accordance with the dimension tolerances shown. . . ."). Deviations in the slightest detail from the specifications required Postal Service approval. (120/121 Specifications § 3.14).

To ensure compliance with its specifications, the Postal Service conducted a first article test on the first Model 120/121 MPLSM unit. The first article test involved a detailed physical and functional examination of the unit, to make sure that it conformed to Postal Service specifications and requirements in all material respects. (Okun Affidavit, par. 8; Model 120/121 Specifications §§ 3.6; 4.4.1; 4.4.1.2). Upon successful completion of the first article test, the Postal Service authorized Burroughs to commence production of MPLSMs. (Okun Affidavit, par. 8).

Once production began, the Postal Service and its on-site representative, the Defense Contractor Administrative Service ("DCAS") conducted detailed inspections. (Okun Affidavit, par. 7; Vogel Affidavit, par. 5). DCAS also reviewed the tests and inspections performed by Burroughs on parts and subassemblies, including the keyboards, pursuant to detailed testing procedures and methods issued or approved by the Postal Service. (Okun Affidavit, par. 7; Vogel Affidavit, par. 5). When DCAS or the Postal Service determined that a part did not conform to specifications, Burroughs corrected the nonconformity subject to further DCAS review and approval. (Okun Affidavit, par. 7). At the end of the production line, DCAS certified that the subassemblies were ready for shipment. (Vogel Affidavit, par. 6). After shipping to post offices around the country, Burroughs technicians assembled and installed the MPLSMs pursuant to detailed layout drawings prepared by the Postal Service. (Vogel Affidavit, par. 8; Okun Affidavit, par. 8; Model 120/121 Specifications 3.13.1). A Postal Service representative was usually present as each machine was assembled. (Vogel Affidavit, par. 8).

After assembly of the prototype machines, the Postal Service conducted a "live mail" test using Postal Service operators over a regular work shift to verify that the machines worked in accordance with specifications. (Vogel Affidavit, par. 8; Okun Affidavit, par. 8). Local post office managers and, sometimes, a Postal Service inspector from Washington, D.C. were present during the live tests. (Vogel Affidavit, par. 8). Burroughs corrected any deficiencies after discussion with Postal Service officials, and another live mail test was conducted. (Vogel Affidavit, par. 9).

Once the live mail test was successfully completed, an exit conference was held in which the Postal Service certified that the machine had been tested, that it conformed in all material respects to the Postal Service specifications, and that the Postal Service accepted the unit. (Vogel Affidavit par. 9; Model 120/121 Specifications § 4.7). The Postal Service ultimately approved and accepted every MPLSM following the live mail test. (Okun Affidavit, par. 8; Vogel Affidavit, par. 9).

Once the machines were accepted by the Postal Service, Burroughs could not and did not supervise their operation. (Okun Affidavit, par. 14; Vogel Affidavit, par. 15). Moreover, the Postal Service, and not Burroughs, was responsible for training the MPLSM operators. (Lieske Affidavit, par. 10). The Postal Service required Burroughs to submit monthly progress reports and attend monthly reviews to discuss production, design, and safety issues.

In 1966 the Postal Service awarded Burroughs a second contract to manufacture approximately fifty MPLSM units. (Okun Affidavit, par. 9). Over the next twenty years, the Postal Service awarded a series of fixed-price, competitive bid contracts to manufacture over 900 MPLSM units. (Okun Affidavit, par. 9; Affidavit of Richard Stotler dated

August 31, 1995, pars. 1, 7). Each of these contracts involved bids based on the Postal Service's "build to print" drawings and specifications, which included requirements for the machine keyboards and consoles, letter sorting rates, and the precise characteristics of the operator chair. (Okun Affidavit, par. 9; Stotler Affidavit, pars. 3, 7; Affidavit of William Selin, December 3, 1994, par. 3; Affidavit of John R. Clarke, December 7, 1994, par. 5; Affidavit of Fred Picus, December 27, 1994, par. 3). As in the previous contract, the Postal Service required strict compliance with its specifications and tested and inspected the machines throughout the manufacture and delivery process. In addition, Postal Service specifications expressly provided for certain specified safety devices and items; while restricting Burroughs from deviating from the specifications. (See MPLSM/ESP Specifications, §§ 1.1, 3.5.7.12). The Postal Service logo remained in the bottom right corner of each MPLSM drawing. (Okun Affidavit, par. 9; Selin Affidavit, par. 3; Picus Affidavit, par. 3; Stotler Affidavit, pars. 3, 7).

Each production contract required Burroughs to conform strictly to the Postal Service drawings and specifications and to obtain Postal Service approval of any proposed changes, including the addition of warnings, markings or labels. (Okun Affidavit, par. 9; Clarke Affidavit, par. 10; Picus Affidavit, par. 3; Stotler Affidavit, pars. 3, 7. See also MPLSM Specifications §§ 3.5.1; 3.5.2; 3.5.4; 3.5.6; Designed Product Specifications §§ 3.1; 3.1.1; MPLSM Engineering Change Procedure). Before beginning production under each contract, the Postal Service conducted and approved a "first article test" to verify the unit's performance against the Postal Service requirements. (Clarke Affidavit, par. 9; Stotler Affidavit, par. 5; Picus Affidavit, par. 5). The Postal Service and DCAS continued to perform, and approve procedures for, on-site, in-process and subassembly inspections at Burroughs' facility to assure conformance with the Postal Service's drawings. (Okun Affidavit, par. 8; Clarke Affidavit, par. 11; Picus Affidavit, par. 4;

Stotler Affidavit, par. 4). The Postal Service sometimes sent its own inspectors to Burroughs' facility to monitor and audit the inspections and tests conducted by Burroughs and DCAS. Burroughs continued to keep the Postal Service apprised of program status through regular program reviews. (Clarke Affidavit, par. 6; Selin Affidavit, par. 5). The Postal Service continued to evaluate each MPLSM through "live mail" testing conducted by Postal Service operators at the installation sites. (Clarke Affidavit, par. 12; Picus Affidavit, par. 6; Stotler Affidavit, par. 6. See also MPLSM/ESP Specifications, §§ 4.4—4.5.9; MPSLM/ESP/ZMT Specifications §§ 4.2.3—4.2.3.1.4; Designed Product Specifications § 3.5.1). Upon successful completion of the live mail test, the Postal Service accepted each machine, certifying that the MPLSM conformed to its specifications. (Picus Affidavit, par. 6; Stotler Affidavit, par. 6; Clarke Affidavit, par. 12; MPLSM/ESP Specifications § 4.6).

The Postal Service continued to maintain exclusive control over its workplace, including the operation of MPLSMs by Postal Service employees. Neither Burroughs nor its successor, Defendant Unisys, supervised the operation of the MPLSMs by Postal Service employees. (Clarke Affidavit, par. 14; Stotler Affidavit, par. 11; Selin Affidavit, par. 9; Picus Affidavit, par. 8; Affidavit of Paul Tartar, December 13, 1994, par. 11; Affidavit of A. Finley France, December 12, 1994, par. 8; Affidavit of James Lazzarotti, August 23, 1995, par. 19). The Postal Service remained responsible for the training of MPLSM operators in the proper use of the machine.[2]

In 1970, the Postal Service entered into a contract with GATX Corporation to modify certain aspects of the MPLSM design. Under the contract, GATX designed and built a zip mail translator ("ZMT") system to be retrofitted on certain MPLSMs around the country. (Okun Affidavit, par. 11; Vogel Affidavit, par. 11). The ZMT added an auxiliary ten-key keyboard above the original MPLSM keyboard to accommodate the Post-

---

**2.** For example, the 1968 MPLSM operator training manual prepared by the Postal Service's Bureau of Operations directs operators to "key numbers with a firm decisive downward thrust

of [their] fingers," and to "[h]old arms parallel to floor, wrists fairly stiff, fingers slightly curved above the keys." Operators are further directed to sit in a "comfortably erect" posture.

al Service's shift from chordal keying of memorized codes to sequential keying of zip code information. (Okun Affidavit, par. 11). Burroughs installed some ZMT kits onto existing MPLSMs, but did not participate in any way in the design of the ZMT system. (Okun Affidavit, par. 11; Vogel Affidavit, par. 11; Clarke Affidavit, par. 3; Selin Affidavit, par. 3).

In 1974, the Postal Service contracted with Burroughs for the manufacture of 150 units of a redesigned MPLSM, designated as "Model 140/141." (Clarke Affidavit, par. 3; Selin Affidavit, par. 3). Unlike the earlier MPLSMs, the Model 140/141 MPLSM incorporated the ZMT system into the design, and was a modularized unit consisting of 18 sections to facilitate transportation and installation. (Clarke Affidavit, par. 4). In all other material respects, the Postal Service directed that the Model 140/141 be functionally identical to the earlier MPLSMs. (*Id.*)

Before production of the Model 140/141 MPLSMs could commence, the 1974 contract required Burroughs to redraft the Postal Service's drawing package to include the ZMT system and the modularization of the MPLSM. Burroughs was not permitted to make any unilateral changes to the design during this redraft, including the addition of warnings, markings or labels, without the prior approval of the Postal Service. (Clarke Affidavit, par. 5; Selin Affidavit, par. 4). During the eighteen-month pre-production phase, the Postal Service and Burroughs held regular program reviews to discuss various design concepts and the program's status. (Clarke Affidavit, par. 6; Selin Affidavit, par. 5; Minutes of MPSLM/ESP/ZMT Program Review, May 21, 1975). These reviews involved participants from several engineering disciplines, including mechanical, electrical, human factors, quality assurance, and training. The participants assessed the program's status and engaged in "back and forth" dialog regarding design concepts and ideas. (Tartar Affidavit, par. 5). Burroughs was not allowed to begin production until each drawing had been reviewed and approved by the Postal Service project management, quality assurance, and engineering departments. (Clarke Affidavit, par. 6).

In 1979 the Postal Service designed the expanded zip retrofit ("EZR") system, an electronic modification that replaced the retrofitted ZMTs and allowed the use of a nine-digit zip code in sorting mail. (Tartar Affidavit, pars. 3, 4). The EZR modification did not alter the MPLSM keyboard or console. (Tartar Affidavit, par. 3).

In approximately 1980, the Postal Service awarded Burroughs a contract to develop a production version of the EZR and to produce production drawings following a prototype designed by the Postal Service. (Tartar Affidavit, par. 4). The 1980 contract provided that Burroughs was not to deviate from Postal Service drawings without permission. (Tartar Affidavit, par. 4). The Postal Service and Burroughs held periodic design reviews in which they assessed the program's status and engaged in a back-and-forth discussion of design concepts and ideas. (Tartar Affidavit, par. 5).

After the Postal Service approved Burroughs' EZR production drawings, the Postal Service conducted a first article test of the system. The first article test entailed a detailed physical and functional inspection to ensure that the EZR system conformed in all material respects to the Postal Service requirements. Upon successful completion of the first article test, the Postal Service authorized Burroughs to begin production. (Tartar Affidavit, pars. 5 and 6). Burroughs was not allowed to make any unilateral changes in the EZR system. (Tartar Affidavit, par. 7).

As with the earlier production contracts, DCAS conducted on-site, in-process and subassembly inspections to ensure conformance to the Postal Service specifications and inspection and test criteria. Following a live mail test, the Postal Service ultimately accepted every EZR system as conforming in all material respects to its requirements. (Tartar Affidavit, par. 8).

The Postal Service later awarded Burroughs two additional EZR contracts. Under these contracts, the Postal Service required Burroughs to comply with detailed production drawings and specifications. Each of these contracts required completion

of a first article test prior to production. As with the first EZR contract, the Postal Service ultimately accepted each EZR system retrofitted on existing MPLSMs as conforming in all material respects to its requirements. (Tartar Affidavit, par. 9).

The Postal Service has studied and evaluated human factors aspects of MPLSM operations since the mid to late 1950s. In 1958 the Postal Service installed the Rabinow model, including the keyboard, in its Washington laboratory. (Lieske Affidavit, par. 2; Hurley Affidavit, pars. 2, 3). The Postal Service also installed keyboards into MPLSM training consoles at the postal laboratory, and assigned human factors engineers to study the interaction between operator and machine. (Hurley Affidavit, par. 5). The Postal Service also evaluated consoles and keyboards over a four year period following installation of the first prototypes, using inspection criteria and specifications developed by the postal laboratory and Postal Service human factors specialists. (Hurley Affidavit, pars. 4, 5, 7; Lieske Affidavit, par. 6).

In the early 1960s, the Postal Service expanded its in-house human factors capabilities, citing a need for "human engineering of operator work stations, including operator keyboards." (See publication prepared by the Postal Service Public Relations Office for the Office of Research and Engineering, entitled: "The Post Office Challenge to Industry," dated September 1962). This expansion included investigating human factors in keyboards and codes, as well as letter-sorting rates. The Postal Service created a human factors laboratory to study human engineering in postal mechanization and created a "Human Factors Research and Development Five-Year Plan," which focused, in part, on developing workspace and keyboard design standards, and addressing fatigue reduction, keyboard design, and operator versus machine pacing of MPLSM work. (See D. Cornog and J. Cornog, "Human Factors Engineering in the Sorting and Handling of Mail," September 29, 1969; "Human Factors Research and Development Five Year Plan," 1968). The Postal Service also issued a list of criteria for using the MPLSMs that included a discussion of hand and arm fatigue in keyboard operations and the use of adjustable chairs with arm rests.

Throughout the 1960s, the Postal Service authored or received several studies addressing human engineering and MPLSM keyboard design. (See Defendant's Exhibit 23). By 1967, there were 55 MPLSMs were in operation in seventeen post offices, and the Postal Service recognized an "immediate" need to perform in-house human engineering studies on operator work stations, including keyboards. ("Post Office Challenge to Industry," May 1967, p. 4).

By early 1970, the United Federation of Postal Clerks was aware that some operators had developed a condition of the wrists attributable to sustained suspension of their hands above the keyboard. (See Minutes of National Mechanization Committee Meeting, United Federation of Postal Clerks, February 19, 1970). During the 1970s, the Postal Service issued or obtained several reports addressing, among other things, human engineering issues involved in MPLSM keyboard operations. (See Defendant's Exhibits 26, 27, 28, 29 and 30). These reports addressed numerous issues, including optimal key pressure, keyboard configuration, proper seating and keying positions, work-rest cycles, operator fatigue, and availability of arm and foot rests.

In 1976 the Postal Service prepared an annotated bibliography of human factors reports, documents, and related publications. (See Defendant's Exhibit 32). The bibliography, containing citations to reports dating back to 1956, listed nearly one hundred human factors reports prepared by or for the Postal Service, many of which related to the MPLSM. The Postal Service updated the bibliography in 1979.

In 1976, the postal workers' union and the National Institute for Occupational Safety and Health ("NIOSH") undertook a long-term study of job stress and health concerns involving the MPLSM, including the effects of keying on MPLSM operators. (Defendant's Exhibit 33). As a part of this study, a survey was conducted which produced a number of complaints, including those from MPLSM operators of stiff or sore wrists, loss

of feeling in fingers and wrists, cramps in fingers, and loss of arm and hand strength. (See transcript of hearing before the Congressional Subcommittee on Postal Personnel and Modernization, House Committee on Post Office and Civil Service, 98th Cong., 2d Sess. 25 (1984)). The results of this study were publicly reported in 1981 at the American Industrial Hygiene Conference. (Defendant's Exhibit 36).

During the 1980s, the Postal Service authored or received numerous other studies addressing cumulative trauma and its association with the MPLSM, and it examined MPLSM operators for muscular pain. Congress held hearings on alleged repetitive stress injuries among postal workers, including MPLSM operators, in 1984. In 1982, MPLSM operators began to file occupational claims alleging injuries resulting from the operation of MPLSMs. The Postal Service began to make modifications, including a simplification of the keying process, noise reduction, strength exercises for operators' hands and wrists, and an employee education program. (See Defendant's Exhibits 37, 38, 39; Transcript of Congressional Hearing).

Burroughs did not conduct any training programs for MPLSM operators. The Postal Service trained and supervised its MPLSM operators and addressed human factors issues in the course of that training. Throughout its performance of the MPLSM contracts, Burroughs provided the Postal Service with any information it had regarding human factors issues related to the operation of the MPLSM. Under the 1966 and 1974 contracts, Burroughs either suggested or investigated alterations to the keyboard and console to address human factors issues. In 1966, Burroughs suggested adjusting the height of the keyboard and incorporating an adjustable "heel of hand" rest in front of the keys to "help in reducing operator fatigue." In 1974, Burroughs investigated an asynchronous keyboard console to allow operators to control the sorting rate. At other times

Burroughs proposed replacing the Rabinow-style keyboard and installing a "solid state" keyboard. The Postal Service evaluated and rejected all of these proposals. (Lazzarotti Affidavit, pars. 3–11; Selin Affidavit, par. 7; Clarke Affidavit, par. 7; Burroughs Presentation to the United States Postal Service dated June 18, 1973 (Defendant's Exhibit 43); MPLSM Improvement Program Final Report, February 25, 1975 (Attachment "C" to Lazzarotti Affidavit)).

## II.

■ Defendant Unisys Corporation asserts the so-called government contractor defense. Unisys argues that it is not subject to tort liability under state law for injuries allegedly caused by equipment its predecessor manufactured according to specifications dictated by the Postal Service. In *Boyle v. United Technologies Corp.*, 487 U.S. 500, 507–08, 108 S.Ct. 2510, 2515–16, 101 L.Ed.2d 442 (1988), the Supreme Court announced a three-prong test for determining when state tort law is displaced by a federal common law in a suit against a military contractor. Under *Boyle*, liability for design defects in military equipment cannot be imposed pursuant to state law when the requisite elements are met. Where the government contractor defense applies the defendant manufacturer is immune from liability under state law. *See Carley v. Wheeled Coach*, 991 F.2d 1117 (3d Cir.1993).

### A. *Applicability of Government Contractor Defense to Non–Military Contracts*

■ As a preliminary matter, the Plaintiff contends that the government contractor defense, as articulated in *Boyle, supra,* does not apply to non-military contracts. The parties acknowledge that there is a split among the courts on that question;[3] and the split is evident in cases both before and after the Supreme Court's decision in *Boyle*.[4] Since

---

**3.** Indeed, some courts have referred to the rule of law established in *Boyle* as the "military contractor defense."

**4.** The following cases have held that the government contractor defense is available to all government contractors: *Carley v. Wheeled Coach,*

991 F.2d 1117 (3d Cir.1993); *Boruski v. United States,* 803 F.2d 1421, 1430 (7th Cir.1986); *Burgess v. Colorado Serum Co.,* 772 F.2d 844, 846 (11th Cir.1985); *Johnson v. Grunman Corp.,* 806 F.Supp. 212 (W.D.Wis.1992); *Price v. Tempo, Inc.,* 603 F.Supp. 1359, 1361–62 n. 3 (E.D.Pa.

the contract at issue here was for the development and production of a letter sorting machine used by the United States Postal Service, and not a contract with a military agency or a contract for the purchase of military equipment or materiel, the Court addresses the scope of the *Boyle* government contractor defense as a threshold matter.

Courts holding that the *Boyle* contractor defense is limited to military contracts have drawn a distinction between the governmental interest at issue in the context of military weapons and equipment and the governmental interest that is generally at issue in all government contracts. *See, e.g. In Re Hawaii Federal Asbestos Cases,* 960 F.2d 806, 810–12 (9th Cir.1992); *In re Chateaugay Corp.,* 146 B.R. 339, 348–51 (S.D.N.Y.1992). These courts have reasoned that the same concerns about impinging upon the military's decision-making process are not present in contracts for the purchase of products readily available on the commercial market. The Ninth Circuit, in particular, has taken a very narrow view of the *Boyle* opinion, referring to the doctrine *Boyle* espoused as the *"military* contractor defense" and holding that it does not apply even to contracts with military agencies if the products involved are readily available on the commercial market. *Hawaii Federal Asbestos Cases,* 960 F.2d 806, 810–812; *Nielsen,* 892 F.2d at 1452–55.

Some courts that have limited the defense to military contractors have drawn support from language used in the *Boyle* opinion. In the opening sentence, Justice Scalia phrased the issue as follows: "This case requires us to decide when a contractor providing military equipment to the Federal Government can be held liable under state tort law *for* injury caused by a design defect." 487 U.S. at 502, 108 S.Ct. at 2513. A subsequent paragraph expresses the high Court's view that the "selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function ..." which involves "not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness." 487 U.S. at 511, 108 S.Ct. at 2518.

This Court does not interpret that language from the *Boyle* opinion as limiting the defense to military contractors. It is true that the Supreme Court in *Boyle* happened to apply the defense in the context of a claim against a military contractor, i.e. the manufacturer of a Marine helicopter, and therefore much of the language in the opinion focuses on the federal government's interest in ensuring an efficient military. However, there is also language in *Boyle* which points unmistakably to a broader application.[5] The governmental interests identified in *Boyle* as the basis for the contractor defense are equally applicable to military and non-mili-

---

1985); *McDermott v. TENDUN Constructors,* 211 N.J.Super. 196, 511 A.2d 690, 696 (App.Div.), *cert. denied,* 107 N.J. 43, 526 A.2d 134 (1986). The following cases have held that the government contractor defense is available only to military contractors: *In Re Hawaii Federal Asbestos Cases,* 960 F.2d 806, 810–12 (9th Cir.1992); *Nielsen v. George Diamond Vogel Paint Co.,* 892 F.2d 1450, 1452–55 (9th Cir.1990); *In re Chateaugay Corp.,* 146 B.R. 339, 348–51 (S.D.N.Y.1992); *Johnston v. United States,* 568 F.Supp. 351, 356–58 (D.Kan.1983); *Jenkins v. Whittaker Corp.,* 551 F.Supp. 110, 114 (D.Haw.1982); *Pietz v. Orthopedic Equipment Co.,* 562 So.2d 152, 155 (Ala. 1989); *cert. denied,* 498 U.S. 823, 111 S.Ct. 75, 112 L.Ed.2d 48 (1989); *Dorse v. Armstrong World Industries, Inc.,* 513 So.2d 1265, 1269 (Fla.1987); *Reynolds v. Penn Metal Fabricators, Inc.,* 146 Misc.2d 414, 550 N.Y.S.2d 811, 812 (N.Y.Sup.Ct. 1990); *In Re New York City Asbestos Litigation,* 144 Misc.2d 42, 542 N.Y.S.2d 118, 121 (N.Y.Sup. Ct.1989); *In re Joint Eastern and Southern District New York Asbestos Litigation,* 897 F.2d 626 (2d Cir.1990).

**5.** See 487 U.S. at p. 506, 108 S.Ct. at 2515, referring to the "Federal Government's interest in the procurement of equipment." Moreover, after discussing the federal government's interest in the performance of its contracts, the *Boyle* Court stated: "The present case involves an independent contractor performing its obligation under a procurement contract, rather than an official performing his duty as a federal employee, but there is obviously implicated the same interest in getting the Government's work done." The *Boyle* Court further reasoned: "The imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price. Either way, the interests of the United States will be directly affected."

tary contracts. *Carley v. Wheeled Coach,* 991 F.2d 1117 (3d Cir.1993).

Moreover, the nature of the underlying test adopted in *Boyle* for determining whether a "significant conflict" exists between state law and the federal procurement interest inherently contradicts the suggestion that the defense is available only to military contractors. The *Boyle* Court explicitly concluded that the contractor defense was not grounded in the *Feres* doctrine,[6] which limits liability for injuries to military personnel. 487 U.S. at 510, 108 S.Ct. at 2517–18. Rather, the Court reasoned, the defense arises within the context of the discretionary function exception to the Federal Tort Claims Act, Title 28 U.S.C. § 1346(b). *Boyle,* 487 U.S. at 511, 108 S.Ct. at 2518. This exception by its explicit terms is not limited to claims arising as a result of actions by the military, but applies to any actions requiring the exercise of discretion by "a federal agency or an employee of the Government." 28 U.S.C. § 2680(a). In fact, the discretionary function exception has been applied directly in cases involving decisions by Postal Service authorities. *See, e.g., Fazi v. United States,* 935 F.2d 535 (2d Cir.1991); *Jurzec v. American Motors,* 856 F.2d 1116 (8th Cir.1988); *Ford v. American Motors,* 770 F.2d 465 (5th Cir. 1985).

■ Accordingly this Court concludes that the government contractor exception, as outlined in *Boyle,* is not strictly limited to contracts for military equipment. The equipment at issue here is a letter-sorting machine designed under the authority of, and purchased by, the United States Postal Service. It is undisputed that the machine was designed to further the basic purpose of the postal service, i.e. delivery of the United States mails. Facilitating the secure and efficient delivery of the United States mails is a legitimate and important goal of the federal government. *See United States Postal Service v. Greenburgh Civic Associations,* 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981). It cannot be disputed that Postal Service authorities, in designing and planning the machine, were exercising a balance of technical, engineering and safety considerations. *See Wisner v. Unisys Corporation,* 917 F.Supp. 1501 (D.Kan.1996). Thus, the rationale for the government contractor defense is implicated here, and Unisys, as the successor to the machine's manufacturer, is entitled to assert the government contractor defense, so long as it meets the threshold test established in *Boyle. Wisner, supra.* The Court concludes that the government contractor defense, if established by the evidence, applies to the Burroughs contract with the United States Postal Service for the development and production of the multi-position letter sorting machine. *Accord, Wisner v. Unisys Corporation,* 917 F.Supp. 1501, Memorandum and Order entered February 20, 1996.

## B. *Elements of Government Contractor Defense*

■ As the Third Circuit noted in *Carley, supra,* the Defendant bears the burden of proving each element of the government contractor defense. The Defendant must show: (1) that the United States approved reasonably precise specifications; (2) that the equipment conformed to those specifications; and (3) that the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. *Boyle,* 487 U.S. at 512, 108 S.Ct. at 2518–19.

In order to satisfy the first element of the government contractor defense, the Defendant must first show that its predecessor designed the MPLSM in compliance with "reasonably precise" specifications. The evidence before the Court here establishes that the Postal Service oversaw the planning and design of the MPLSM in great detail. The design requirements for the MPLSM were comprehensive, including the allegedly defective console and keyboard designs. The Postal Service specifications required, for example, that the console have two keyboards, each of which:

> shall be binary decimal type arranged for two-hand operation having two groups of five keys, and shall be provided as part of the console by the contractor. All keys

---

**6.** Referring to *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950).

shall be unmarked, with a smooth concave surface except the two center keys in the lower group which shall be longer and have more depth to index the thumb of each hand and simplify the touch system of the keyboard. . . .

(Specification 3.10.1.6.) Other specifications govern key pressure adjustments and chair and operator posture. (Specification 3.10.1.6, Specification 3.10.1.10.)

The Defendant has submitted an affidavit from Harold Lieske, former Assistant Director of the United States Postal Service Office of Research and Development, stating that the Postal Service "developed a comprehensive set of detailed production drawings and specifications for the MPLSM, including keyboard and speed control specifications." (Affidavit of Harold Lieske, par. 7). Mr. Lieske reviewed, approved and signed every MPLSM drawing, including a detailed drawing of the keyboard dated February 28, 1964. An affidavit from the former chief of the Postal Service Laboratory avers that the Postal Service specifications governed the keyboard's design, speed of operation and materials, as well as key shapes, tension, and triggering pressure. Deviations from these specifications were subject to approval by the Postal Service.

The Postal Service specifications for the MPLSM comprise some 50 single-spaced pages of text, plus detailed engineering drawings. These specifications stand in stark contrast to the hypothetical example described in *Boyle, supra,* wherein the Supreme Court indicated that the first element would not be met where the government contracts for the purchase of an "air conditioning unit, specifying the cooling capacity but not the precise manner of construction." 487 U.S. at 509, 108 S.Ct. at 2517.[7]

■ The Plaintiff separately challenges the scope of the specifications with regard to his failure to warn theory. He argues, in essence, that even if the specifications were "reasonably precise" with regard to design, his failure to warn theory survives because the specifications did not prohibit the manu-

facturer from placing warnings on the machine. This argument interprets the government contractor defense too narrowly. *Boyle* does not require that the governmental authority dictate all product design requirements to the contractor; rather, it requires only governmental "approval" of the design. 487 U.S. at 512, 513, 108 S.Ct. at 2518–19.

Here the Postal Service approved a comprehensive set of specifications, complete with detailed drawings. Among other things, the specifications provided that:

"The machine shall be furnished with suitable devices as required by the specifications and as shown on the drawings. . . . All special safety devices . . . for protection of operators . . . shall be provided as specified herein, or as shown on the drawings. . . ."

(Specification 3.11.7.12). The specifications prohibited Burroughs from deviating from the engineering drawings "in the slightest detail" without Postal Service approval. (Specification 3.14). Clearly, Burroughs could not have made unilateral changes to the MPLSM, including the addition of warnings, markings or labels, without prior Postal Service approval. The Court concludes, accordingly, that the specifications were "reasonably precise" even with regard to warnings and labeling.

The Plaintiff does not dispute the Defendant's contention that the MPLSMs manufactured by Burroughs comply with Postal Service specifications; thus the second element is uncontroverted. As for the third element of the government contractor defense, the Plaintiff has failed to refute the Defendant's evidence that Burroughs had no knowledge of dangers associated with the MPLSM that were not also known to the Postal Service. *Accord, Wisner v. Unisys Corporation,* 917 F.Supp. 1501 (D.Kan.1996). Moreover, from the time the MPLSMs were accepted and put into operation, the Postal Service had exclusive authority over their use and the training and supervision of MPLSM operators. Thus, the Postal Service was in a markedly superior position to monitor the effects of the use of the machine and

---

7. The "air conditioner" illustration also dispels the notion that the *Boyle* Court intended that the

government contractor defense be limited to contracts for military equipment and materiel.

was, in fact, in possession of at least as much information on the dangers of MPLSM use as Burroughs. *Wisner*, 917 F.Supp. at 1511. The Court concludes, based on this evidence, that the Defendant has established the third element of the government contractor defense.

### III.

The Court concludes that the Plaintiff has failed to establish the existence of a genuine issue of material fact regarding any element of the Defendant's affirmative defense. Defendant Unisys Corporation has established the elements of the government contractor defense and is, therefore, entitled to summary judgment. Fed.R.Civ.Pro. 56(c). The Defendant's Motion for Summary Judgment is hereby GRANTED.